Chief Judge Fuld.
 

 On July 15, 1970, seven children were killed, and approximately 50 others injured, when the bus in which they were traveling, owned by the Tedesco Company and apparently in an unsafe condition, went off the road near Allentown, Pennsylvania. Because the children were mostly from Nassau County, the accident was widely publicized in the Long Island press. Less than two weeks later,
 
 Newsday
 
 reported that another Tedesco bus, chartered by plaintiff Trails West, Inc., and carrying Long Island children on a cross-country tour to California, had been involved in a series of accidents. Some of the children lived in Congressman Lester Wolff’s congressional district. The present libel suit stems from the latter’s investigation into the safety of the two buses in which the children were traveling and the newspaper reports of his findings.
 

 The plaintiffs, 10 interrelated corporations engaged in organizing guided bus tours for children and two individual officers of those corporations charge that Congressman Wolff and Howard Paster, his administrative assistant, wrote and published press releases which they “ caused to be published ” in
 
 Newsday
 
 
 *212
 
 and the
 
 Long Island Daily Press
 
 on July 30, 1970. According to the complaint, the statements, allegedly ‘1 false and defamatory ’ ’ and written ‘ ‘ either with knowledge of their falsity or with reckless disregard of whether they were false or true,” dealt with the assertedly dang’erous and defective condition of one of the buses chartered by plaintiff Trails West on the above-mentioned trip to California.
 
 [1]
 

 The defendants, claiming that the statements attributed to them were ‘1 constitutionally privileged ’ ’ and made
 
 ‘1
 
 in good faith and without malice ”, moved for summary judgment dismissing the two causes of actions on those grounds.
 

 The court at Special Term granted the defendants’ motion. Applying the rule of
 
 New York Times Co.
 
 v.
 
 Sullivan
 
 (376 U. S. 254) and
 
 Rosenbloom
 
 v.
 
 Metromedia
 
 (403 U. S. 29) —that statements involving matters of public interest are constitutionally privileged unless made with
 
 “
 
 actual malice ” — it held that the plaintiffs had ‘1 failed to make an affirmative showing that the reports were actually false or that the defendants actually knew that same were false at the time of their release to the press,” Although recognizing that summary judgment was to be employed with caution in libel suits of the present sort, the court concluded that'“ no genuine triable issue exists with respect to whether the defendants intended to inflict harm through falsehood. ’ ’ The Appellate Division unanimously affirmed the resulting order (39 A D 2d 844).
 

 Defendant Wolff’s release to the newspapers was based on a report telephoned to his office by Mr. Frank White, Technical Field Coordinator of the Bureau of Motor Carrier Safety of the United States Department of Transportation in Washington, on July 29,1970. Mr. White reported that he had learned from Mr. Howard Caston, California Regional Director of the Bureau, that, as a result of an investigation by the California Highway Patrol (Inspection Report, July 27, 1970), one of the two buses involved—bus No. 85—was found to have several defects, including a
 
 “
 
 tread separation ” in a tire, a
 
 “
 
 headlight out ” and a “ 3-foot hole in [the] baggage compartment which also
 
 *213
 
 leads up to passenger section in bus '* * * Danger in this is it could lead to carbon monoxide gas to passengers.” After calling Mr. White back to confirm this information, defendant Paster made a further check with Mr. Gaston, who in general terms substantiated White’s report and advised Paster that the bus was being ordered out of service, pursuant to a telegram to the California Highway Patrol.
 

 On that same day, July 29, the individual plaintiffs and their attorney, who had been checking on bus No. 85, called Paster to say that the ‘ ‘ allegations were false and that the bus had in fact passed inspection” and to ask that he “pull his press release.” In light of the official information which they had received, however, the defendants declined to comply, and the substance of both Mr. White’s and Mr. Gaston’s statements was relayed to the press.
 
 [2]
 
 On July 30, the newspapers printed the articles about which the plaintiffs complain. They detailed the defects in bus No. 85 substantially as Mr. White had described them to Paster and as Paster had relayed them to the reporters; they also recorded Mr. Gaston’s statement that the bus had been “ ordered out of service ”.
 
 [3]
 
 It was, in fact, taken out of service on July 30, the California “ Compliance Check ” Beport by Mr. Gaston on that date confirming the existence of the hole in the baggage compartment and noting, among other things, “ Headlight switch inoperative ”.
 

 At a conference with the plaintiffs’ attorney after the articles had been printed, defendant Wolff offered to send a statement prepared by the plaintiffs’ attorney to the Bureau of Motor Carrier Safety, asking it to investigate and explain any inconsistencies. In its reply, acknowledging receipt of the July 27 Inspection Beport of the California Highway Patrol, the bureau wrote
 
 *214
 
 that “ Regional Director Howard Gaston of our Bureau on July 30,1970, inspected this same vehicle and found substantially the same deficiencies.”
 

 The plaintiffs did not deny that the bus had been ordered out of service or that Mr. White had reported the deficiencies as attributed to him by defendant Paster. They contend, however, that all of the defects listed in the California Inspection Report of July 27 were minor ones which they were given 15 days to remedy and that the defendants had falsely reported that the bus was ordered out of service because the defects were not immediately remedied; that the defendants had exaggerated the actual deficiencies; that Mr. White’s statement from Washington with regard to carbon monoxide fumes was nowhere mentioned in either California Report; that Mr. Gaston’s action in ordering bus No. 85 out of service—not taken until July 29, two days after the July 27 report—was actually done “ on orders from Wolff” after the defendants had already falsely reported that such action had been taken and that defendant Wolff had allegedly falsely reported that the inspections had originated from his investigation rather than from that of Trails West.
 
 [4]
 

 Upon the present appeal, the plaintiffs contend, first, that the defendants are not entitled to claim the constitutional privilege afforded defendants in libel suits pursuant to
 
 New York Times Co.
 
 v.
 
 Sullivan
 
 (376 U. S. 254,
 
 supra)
 
 and
 
 Rosenbloom
 
 v.
 
 Metromedia
 
 (403 U. S. 29,
 
 supra)
 
 and, second, that, in any event, a question of fact is presented, barring the grant of summary judgment, as to whether the defamatory falsehood charged “was published with knowledge that it was false or with reckless disregard of whether it was false or not.”
 
 (Rosenbloom
 
 v.
 
 Metromedia,
 
 403 U. S. 29, 52,
 
 supra.)
 

 The point of departure for our determination is the
 
 Rosenbloom
 
 case (403 U. S. 29,
 
 supra).
 
 There, the petitioner Rosen
 
 *215
 
 bloom, acquitted of a charge of selling obscene magazines, brought a libel suit against a radio station for broadcasting that books, which he had sold and possessed in his home, were “ obscene.” Acknowledging that the police campaign to enforce the obscenity laws was an issue of public interest (p. 40), Bosenbloom argued that, because he was a private citizen, the radio station was bound to a higher degree of care than the
 
 New York Times
 
 standard. The “ knowing-or-reckless-falsity ” requirement, according to Bosenbloom, applied only in the case of public figures or other prominent persons. The Supreme Court rilled, however, that the
 
 New York Times
 
 standard applies in all state civil libel suits by a “ private individual ” for a defamatory falsehood with respect to his involvement “in an event of public or general interest ” (pp. 31-32). Justice Bkeunan, writing for the majority, declared (pp. 43-44):
 

 “ We honor the commitment to robust debate on public issues, which is embodied in the First Amendment, by extending constitutional protection to all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous.
 

 “ * * * It is clear that there has emerged from our cases since
 
 New York Times
 
 the concept that the First Amendment’s impact upon state libel laws derives not so much from whether the plaintiff is a ‘ public official, ’ ‘ public figure, ’ or ‘ private individual, ’ as it derives from the question whether the allegedly defamatory publication concerns a matter of public or general interest.”
 

 Although the plaintiffs seek to avoid the impact of
 
 Rosenbloom
 
 by asserting that the true facts surrounding the inspection of the two buses, rather than the defendants’ false version thereof, did not deal with ‘ ‘ an event of even trivial public interest ’ ’ the public interest motif was manifest. Following the well-publicized Allentown tragedy, which involved Long Island children in a Tedeseo bus, public concern -for the safety of Tedesco buses chartered by plaintiff Trails West, as well as for the safety of other Long Island children, is too obvious for extended comment. The subject was certainly as newsworthy as the arrest of a per
 
 *216
 
 son for distributing allegedly obscene magazines
 
 (Rosenbloom
 
 v.
 
 Metromedia,
 
 403 U. S. 29, 45, supra); the quality of food in the plaintiff’s restaurant
 
 (Twenty-Five East 40th St. Rest. Corp.
 
 v.
 
 Forbes, Inc.,
 
 30 N Y 2d 595); a dispute about a garbage disposal site
 
 (Frink,
 
 v.
 
 McEldowney,
 
 29 N Y 2d 720); or inaccuracies in the testing of clinical specimens by a mail-order laboratory
 
 (United Med. Labs.
 
 v.
 
 Columbia Broadcasting System,
 
 404 F. 2d 706, cert. den. 394 U. S. 921).
 

 In their further attempt to distinguish
 
 Rosenbloom
 
 from the case before us, the plaintiffs declare that it may not be construed to extend the
 
 Times
 
 principle to either “ purely private libels, involving defamation of a private business by a non-news media defendant ” or to a Congressman’s “ press release ” which “ is not a newspaper at all ”. Protection of the present defendants, the plaintiffs maintain, “would convert the citizen’s right of governmental criticism into a privilege of government officials to assault and destroy private reputations.”
 
 [5]
 

 Contrary to the plaintiffs’ claim, the constitutional privilege in ‘ ‘ private ’ ’ libel suits involving defamation of a “ private business ” cannot be withheld simply because the present alleged defamers are non-news-media defendants rather than a newscaster, as in
 
 Rosenbloom.
 
 The entire thrust of that case is that the constitutional protection is to be accorded not only where public officials or other prominent persons are involved but also where an event of public interest is concerned. “ If a matter is a subject of public or general interest,” the Supreme Court there wrote (403 U. S., at p. 43), “ it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not ‘ voluntarily ’ choose to become
 
 *217
 
 involved. The public’s primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant’s prior anonymity or notoriety.” Accordingly, the court concluded,
 
 ‘ ‘
 
 the time has come forthrightly to announce that the .determinant whether the First Amendment applies to state libel actions is whether the utterance involved concerns an issue of public or general concern, albeit leaving the delineation of the reach of that term to future cases ” (pp. 44-45).
 

 That the present bus controversy is within
 
 “
 
 the reach of that term ” admits of no doubt. That the allegedly libelous defendant may have no connection or association with the news medium is beside the point. Once public concern or interest is shown, as it has been here, the privilege applies, and it matters not who the defendant is. In point of fact, non-news-media defendants in defamation suits have often been found qualifiedly privileged. And, in at least one instance, the petitioner, just as the plaintiffs herein, was a private individual, an assistant general manager of Pinkerton’s National Detective Agency, the defendants being a labor union and its officers. (See
 
 Linn
 
 v.
 
 Plant Guard Workers,
 
 383 U. S. 53.)
 
 [6]
 

 Furthermore, the plaintiffs ’ intimation that the standard does not apply when the individual defendant is a Congressman seems almost frivolous. If a candidate for public office is deemed entitled to the protection of the
 
 Times
 
 principle (see
 
 St. Amant
 
 v.
 
 Thompson,
 
 390 U. S. 727), certainly, an elected official merits the same protection. Indeed, a Congressman, who is required by his office to speak out frequently on matters of public or general concern is even more in need of its protection than a private citizen. The threat of damage suits against public officials,
 
 *218
 
 it has been said in a related context, tends to “ 1 inhibit the fearless, vigorous, and effective administration of policies of government ’ and
 
 ‘
 
 dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties.’
 
 Barr
 
 v.
 
 Matteo, * *
 
 * 360 U. S. [564], at 571.”
 
 (New York Times Co.
 
 v.
 
 Sullivan,
 
 376 U. S. 254, 282, supra; see, also,
 
 Gregoire
 
 v.
 
 Biddle,
 
 177 F. 2d 579, 580.) Without the protection of the privilege announced in the
 
 Times
 
 case, a Congressman’s service both to his constituents and to the common weal is likely to suffer.
 

 Equally without substance is the plaintiffs’ contention that a Congressman’s press release — “ not a newspaper at all” — is outside the
 
 Times
 
 privilege. The complaint speaks of press releases as having been
 
 “
 
 punished ” in the Long Island newspapers. What it necessarily refers to, however, are Paster’s
 
 oral
 
 statements to reporters. The only written press release on the subject was that of August 3
 
 (supra,
 
 p. 213, n. 2), not mentioned in the complaint.
 

 However, even if the defendants had published and distributed a press release, the plaintiffs’ attempt to equate it with the Dun and Bradstreet private subscription credit reports is very wide of the mark. (See
 
 Grove
 
 v.
 
 Dun & Bradstreet, Inc.,
 
 438 F. 2d 433.) In the
 
 Grove
 
 case, a Federal Court of Appeals held that a commercial company, publishing private credit data for profit and imposing severe limits upon republication, “ ha[d] not assumed the role of informing the public at large ” (p. 437) and is not concerned with a matter of genuine public interest. That being so, the court held that the defendant’s publication was
 
 “not
 
 a medium entitled to [the] extended constitutional protection ” of the
 
 Times
 
 privilege (p. 437). Far different, however, from the
 
 1 ‘
 
 covert reportage ’ ’ of the Dun and Bradstreet information sheet (438 F. 2d, at p. 437) is the information contained in a Congressman’s press release to his constituents. Expressly intended to foster open discussion about events of public interest and to be as widely disseminated as possible, such a publication has all the characteristics, if not the circulation, of a newspaper.
 

 This brings us to the plaintiffs’ argument that, even if the defendants may rely upon constitutional privilege, the decision below must be reversed, since the plaintiffs’ affidavits contain evidence — entitling them to a jury trial—which indicates that
 
 *219
 
 the defendants were guilty of actual malice, that is, that they published their statement ‘ ‘ with knowledge that it was false or with reckless disregard of whether it was false or not ” (376 U. S., at p. 280).
 
 [7]
 

 “ ‘ Reckless disregard,’ ” the Supreme Court has said in
 
 St. Amant
 
 v.
 
 Thompson
 
 (390 U. S. 727,
 
 supra),
 
 “cannot be fully encompassed in one infallible definition” (p. 730). Reckless conduct, the court continued (p. 731), “is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice. ’ ’ Other indices of reckless publication have been found in the existence of “ obvious reasons to doubt the veracity of the informant or the accuracy of his report ”
 
 (St. Amant
 
 v.
 
 Thompson,
 
 390 U. S., at p. 732); “ a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers ’ ’
 
 (Curtis Pub. Co.
 
 v.
 
 Butts,
 
 388 U. S. 130, 155); or a “ high degree of awareness of * * * probable falsity”.
 
 (Garrison
 
 v.
 
 Louisiana,
 
 379 U. S. 64, 74.) On the other hand, reliance upon reputable sources of1 information, whether official or simply a reliable newspaper, if unrefuted, is sufficient to disprove a claim of recklessness. (See, e.g.,
 
 Schneph
 
 v.
 
 New York Post Corp.,
 
 16 N Y 2d 1011;
 
 Miller
 
 v.
 
 News Syndicate Co.,
 
 445 F. 2d 356, 358; see, also,
 
 Rosenbloom
 
 v.
 
 Metromedia,
 
 403 U. S. 29, 56,
 
 supra.)
 

 All of the evidence before us demonstrates that the defendants relied only upon official, governmental sources and reported truthfully the information such sources gave them. This the plaintiffs do not really deny. Rather, they dub the sources “ third-hand ” and, as indicated, assert that the defendants were guilty of careless and irresponsible investigation and reporting in repeating Mr. White’s statement about carbon monoxide
 
 *220
 
 fumes, not contained in the reports, in exaggerating the headlight and tire defects and in attributing the out-of-service order to the plaintiffs’ failure to correct the deficiencies. The defendants’ conduct was the more irresponsible, the plaintiffs urge, because they had been advised by both the plaintiffs and their attorney that the deficiencies of bus No. 85 were minor and were warned that they would be held to account for their statements.
 

 The defendants, however, had no reason to doubt the veracity of Mr. White or Mr. Gaston —the first being the Washington Field Coordinator and the second, the California Regional Director of the Bureau of Motor Safety of the United States Department of Transportation. It would be difficult for them to seek a higher authority, let alone have serious doubts of their veracity. Moreover, they had checked with Mr. White a second time, and their account of the statements of1 both White and Gaston were substantially documented in the official Inspection Report and Compliance Check and in Gaston’s July 29 telegram. Inaccuracies, in describing defects — the principal item, the hole in the- baggage compartment, unquestionably accurate — or in regard to the inspections and the out-of-service order, may not stamp the defendants guilty of reckless conduct. Even if they could be deemed to have been unreasonable or careless, the defendants were still innocent of actual malice. “ [T]he reckless disregard standard ”, the Supreme Court observed in
 
 St. Amant
 
 v.
 
 Thompson
 
 (390 U. S. 727, 731,
 
 supra), “
 
 may permit recovery in fewer situations than would a rule that publishers must satisfy the standard of the reasonable man ”. In addition, the defendants were certainly entitled to accept the word of officials charged with responsibility for highway safety rather than the pleas and threats of interested parties and their attorney. (Cf., eg.,
 
 Bernhard & Co.
 
 v.
 
 Finance Pub. Corp.,
 
 25 N Y 2d 712.)
 
 [8]
 

 
 *221
 
 It is well .settled that summary judgment is properly granted where a qualified privilege obtains and the plaintiffs offer an insufficient showing of actual malice. (See, e.g.,
 
 Schneph
 
 v.
 
 New York Post Corp.,
 
 16 N Y 2d 1011,
 
 supra; Thompson
 
 v.
 
 Evening Star Newspaper Co.,
 
 394 F. 2d 774, cert. den. 393 U. S. 884;
 
 Hurley
 
 v.
 
 Northwest Pub.,
 
 273 F. Supp. 967, affd. 398 F. 2d 346; see, also,
 
 Shapiro
 
 v.
 
 Health Ins. Plan,
 
 7 N Y 2d 56, 64 [awarding summary judgment to defendants in absence of showing of
 
 “
 
 actual malice,” defined as
 
 “ ‘ “
 
 personal .spite or ill will, or culpable recklessness or negligence ” ’ ” (p. 61)] ;
 
 Cole Fisher Rogow, Inc.
 
 v.
 
 Carl Ally, Inc.,
 
 25 N Y 2d 943; 4 Weinstein-Korn-Miller, N. Y. Civ. Prac., ¶3212.05c, p. 32-142.26
 
 et seq.)
 
 A “ mere hope ”, the Federal court said in the
 
 Hurley
 
 case (273 F. Supp. 967,
 
 supra), “
 
 that somehow or other on cross examination credibility of a witness * * * can be put in issue is not sufficient to resist a motion for summary judgment.” And, continued the court (p. 974),
 
 “
 
 A mere chance that somehow, somewhere, on cross examination or otherwise plaintiffs will uncover something which might. add to their case but obviously of which now they have no knowledge, is mere speculation and conjecture and is not sufficient in view of the showing made here by the defendant.”
 

 In the ease before us, the plaintiffs have made no showing of knowing or reckless falsity. As noted, the deficiencies reported by the defendants were basically those related to them by White and Gaston, official and creditable authorities, and in essence substantiated by documentary evidence in the form of the California Inspection and Compliance Check Reports. The defendants’ statements with respect to the timing of inspections and the out-of-service order, moreover, were not shown to have been knowingly false or recklessly made. In point of fact, the plaintiffs’ challenges to them are based] not on facts entitling them to resist a grant of summary judgment, but upon
 
 “
 
 [suspicion, surmise and accusation”; these
 
 “
 
 are not enough.”
 
 (Shapiro
 
 v.
 
 Health Ins. Plan,
 
 7 N Y 2d 56, 64,
 
 supra.)
 

 The same absence of proof to raise an issue of knowing or reckless falsity likewise deprives the plaintiffs of any right to further pretrial discovery. (See, e.g.,
 
 Cerrito
 
 v.
 
 Time, Inc.,
 
 302 F. Supp. 1071, affd. 449 F. 2d 306;
 
 Cervantes
 
 v.
 
 Time, Inc.,
 
 330 F. Supp. 936, 940, affd. 464 F. 2d 986.) They have already examined
 
 *222
 
 Paster and two newspaper reporters. An examination of Wolff, White and G-aston arid a further examination of Paster which they desire was properly denied them. Nothing that they might discover from White and G-aston could render the defendants’ reliance upon their reports irresponsible or reckless. It would be futile, indeed, to allow them to interrogate Wolff or to question Paster further in the hope of getting them to change their well-documented stories.
 

 The order appealed from should be affirmed, with costs.
 

 Judges Burke, Breitel, Jasen, Gabrielli, Jones and Wachtler concur.
 

 Order affirmed.
 

 [1]
 

 . In addition to Wolff and Paster, the plaintiffs named as defendants, among others, the two Long Island newspapers and two of their reporters and sought $8,000,000 in damages. Only the ninth and tenth causes of action
 
 [1]
 
 —against defendants Wolff and Paster — are here involved.
 

 [2]
 

 .
 
 The only press release issued by defendant Wolff was one distributed to newspapers (entitled “Press release Week of August 3, 1970”) which simply reported that the “Congressman [Wolff] said that while one of the buses was in good condition the second had several safety problems that required repair before it could be permitted back into service.”
 

 [3]
 

 . On July 31,
 
 Newsday
 
 printed another article which the plaintiffs likewise maintain falsely intimates that bus No. 85 was unsafe. It discussed the “ extensive inspection” ordered for all Tedesco buses as well as the incidents in California. It then recited: “Wolff said, ‘Under the circumstances, I am drafting legislation that would make it a criminal act for any operator to put buses on the road with any knowledge of unsafe conditions.’ ”
 

 [4]
 

 . The plaintiffs also objected to the fact that defendant Wolff had let stand in one of the news articles his charge that the
 
 “
 
 same bus operator ” involved in the Allentown accident had “taken the children across country” in bus No. 85, although what he meant was the “ same bus owner.” It seems obvious, however, from defendant Wolff’s statement in the July 31 article
 
 (supra,
 
 n. 3, p. 213), as well as from one of the newspaper arteles, that the words “ own ” and “ operate ” and “ owner ” and “ operator ” were sometimes used interchangeably.
 

 [5]
 

 . Two further arguments of the plaintiffs may be disposed of briefly. They urge that the defendants may not avail themselves of their
 
 congressional
 
 privilege (of absolute immunity) off the floor of Congress, citing
 
 James
 
 v.
 
 Powell
 
 (14 N Y 2d 881) and
 
 Cheatum
 
 v.
 
 Wehle
 
 (5 N Y 2d 585, 593-594). However, the defendants have not claimed any such privilege and, indeed, have no need to do so here. They also contend that, even if the
 
 New York Times
 
 privilege were applicable, Special Term incorrectly applied it, in holding that no factual issue existed as to “whether the defendants intended to inflict harm through falsehood.” Their argument is without substance. Having referred to the
 
 Times
 
 standard of knowing or reckless falsity earlier in his opinion, it is obvious that the court was using the two terms interchangeably as had the Supreme Court in
 
 Henry
 
 v.
 
 Collins
 
 (380 U. S. 356), the case upon which it relied.
 

 [6]
 

 . Indeed, the Supreme Court in
 
 Rosenbloom,
 
 (403 U. S. 29, 30-31, n. 1,
 
 supra)
 
 actually cited several non-news-media cases in which the
 
 Times
 
 standard had been previously invoked and applied by it:
 
 Pickering
 
 v.
 
 Board of Educ.
 
 (391 U. S. 563) involved an action by the board of education against a school teacher seeking his dismissal because of a letter he published;
 
 St. Amant
 
 v.
 
 Thompson
 
 (390 U. S. 727), an action by a deputy sheriff against a defeated candidate for the United States Senate;
 
 Linn
 
 v.
 
 Plant Guard Workers
 
 (383 U. S. 53,
 
 supra),
 
 already described above. In
 
 Henry
 
 v.
 
 Collins
 
 (380 U. S. 356, supra)—not cited in the
 
 Bosenbloom
 
 footnote—the Supreme Court applied the
 
 Times
 
 standard in an action by public officials against a private citizen.
 

 [7]
 

 . In this connection, it should be emphasized that, because of this constitutional privilege, we are not concerned with the
 
 actual
 
 truth or falsity of the defendants’ statements but only with whether they were knowingly false or made with reckless disregard of their truth. (See, e.g.,
 
 Pauling
 
 v.
 
 National Review,
 
 22 N Y 2d 818.)
 

 [8]
 

 . Far different was the situation in
 
 Curtis Pub. Co.
 
 v.
 
 Butts
 
 (388 U. S. 130,
 
 supra),
 
 upon which the plaintiffs rely, in which the Supreme Court upheld an award of general and punitive damages in favor of an athletic director against a magazine which, in accusing him of conspiring to fix a football game, had acted in reckless disregard of the truth. The article was based upon an affidavit concerning a telephone conversation between the plaintiff and a coach, accidentally overheard by the affiant, a person whose integrity was known to be questionable. No attempt was made to check upon or find independent support for his story, even after the plaintiff and his daughter had advised the magazine editors that it was untrue.