Abraham J. Gellinoff, J.
Defendants in this defamation action move for summary judgment. The undisputed facts show that in December, 1973, and in April, 1974, defendant John Stossel, a reporter and news broadcaster for defendant Columbia Broadcasting Systems, Inc. (CBS), published a tele *679 vised report about computer programming schools. His account concerned the industry generally, with particular emphasis on plaintiff Commercial Programming Unlimited, of which plaintiff Walter Small is principal owner.
Plaintiffs complain specifically about the following statements made by Stossel, in his December report on CBS’s New York station, WCBS-TV, during "The Eleven O’Clock Report”:
"About five years ago * * * some of the greatest job opportunities were in the computer field. All kinds of people who could operate computers made all kinds of money. Well, today, the computer field is not growing as fast but the computer schools are still looking for customers.
"Computer School frauds probably reached its heyday three years ago. Typically, people who swept floors, washed dishes, or held other low paying jobs saved money for years to earn the tuition so that they could be trained for a glamorous high paying job. The schools unfortunately often collected the tuition, went out of business and then reopened under another name. The student lost his savings and got no training. In 1970, the New York State Attorney General’s Office launched an investigation. Some of the abuses were cleared up. There were about 40 computer schools in New York City at the time. Today, only about ten are left. This one is the largest: Commercial Programming Unlimited. They train 3000 students at a time. Two thousand graduate.
"At the time of the Attorney General’s investigation, Commercial Programming was considered one of the good operations in a bad field. Company president, Walter Small, was even interviewed by Channel '2’ for a broadcast about those fly-by-night computer schools. Walter Small has since become quite a success. He says his school is the largest in the country, but according to the Department of Consumer Affairs, the school’s reputation has changed.
Learning about computers from Commercial Programming costs you, depending upon what courses you take, from $500 to $1500. If you don’t have all that money — don’t worry, Commercial Programming will loan some of it to you at 56% annual interest for some courses, 400% for others. The students want the training badly.
"It may be a false hope. Most of the business machine companies we called said they train their own people. Some said they have hired from computer schools but they are not hiring now. The Department of Consumer Affairs has lots of
*680 complaints from people who took computer courses and then found they just couldn’t get a job.
"Among other complaints about Commercial Programming, they pass out these booklets which say on them, Approved by the New York State Department of Education. Unfortunately, the Department of Education has no such stamp, and has not approved this book.
"There are plenty of other computer schools that have been complained about. Our point is not to single out Commercial Programming. We picked it because it is the largest school. The point is that there is no guarantee that any of these schools will ever get you a job. All you can do is check the want ads in the paper and call the companies to find out their hiring policies. Find out if they do hire vocational school graduates. Many companies won’t. But I doubt that the vocational school will tell you that.”
Plaintiffs also complain about the April broadcasts on WCBS-TV during "The Six O’Clock Report” and "The Eleven O’Clock Report”, in which Stossel repeated some of the above quoted material, and added: "Today, however, the Federal Trade Commission filed a complaint against two computer schools. Commercial Programming is one of them. The complaint charges that CPU’s training is virtually worthless. The commission says that it may go to court to try to get refunds for some students.”
Defendants Stossel and CBS argue that even if the challenged statements were false — which they do not concede— they are nevertheless entitled to dismissal of the complaint (CPLR 3211, subd [a], par [7]; subd [c]). They contend that the statements were privileged, and that plaintiffs do not set forth facts raising a bona fide issue of actual malice. Plaintiffs, on the other hand, contend that the allegedly defamatory statements were not privileged, and that, in any event, triable issues of fact exist as to whether defendants published the statements with actual malice.
Plaintiffs rely upon the recent decision of the Supreme Court of the United States in Gertz v Robert Welch, Inc. (418 US 323 [1974]), where the court largely left the question of privilege for the States to resolve. In order to properly apply the holding of the Gertz decision, it is first necessary to place it in the context of the court’s prior pronouncements on the subject.
The seminal decision on the issue of privilege is New York *681 Times Co. v Sullivan (376 US 254). There, the court, without dissent, established as a fundamental rule that (pp 279-280): "The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice’ — that is, with knowledge that it was false or with reckless disregard of whether it was false or not.” While the privilege which the court announced pertained only to statements made about a public official, the court, in its decision, nevertheless deemed it appropriate to quote with approval from a decision of the Supreme Court of Kansas, as follows: " 'This privilege extends to a great variety of subjects, and includes matters-of public concern, public men, and candidates for office.’ ” (Coleman v MacLennan, 78 Kan 711, 723, quoted at 376 US 254, 281-282, supra; emphasis added.)
The Supreme Court expanded the New York Times rule in Curtis Pub. Co. v Butts, and in its companion case, Associated Press v Walker (388 US 130). Butts involved the defamation of a well-known athletic director of a State university who was paid by private funds. Walker involved a private individual, albeit a retired army general, who participated in racial agitation at the campus of the University of Mississippi.
The court held that the New York Times rationale was applicable not only to "public officials” (see, in this connection, Rosenblatt v Baer, 383 US 75), but also to "public figures” who are "involved in issues in which the public has a justified and important interest” (388 US 130, 134, supra). The court unanimously found that the plaintiffs in both cases were "public figures”; the athletic director had previously been a famous football coach, and was negotiating to coach a professional football team at the time of the publication complained of, which accused him of "fixing” a football game; the retired general — who, the publication asserted, led a mob to attack Federal officers during campus racial disorders — had made many public appearances with regard to Federal intervention to enforce school desegregation, "and could fairly be deemed a man of some political prominence” (388 US 130, 140, supra). And the court concluded that "the public interest in the circulation of the materials here involved, and the publisher’s interest in circulating them, is no less than that involved in New York Times” {388 US 130, 154, supra).
The court divided, however, on the degree of care required *682 of a publisher with regard to a "public figure” as distinguished from a "public official.” In the announced opinion of the court, Mr. Justice Harlan, speaking also for Justices Clark, Stewart and Fortas, "would hold” that a "public figure” was entitled to judgment for a defamation published through "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers” (388 US 130, 155, supra). The majority of the Justices, however, concluded otherwise. Chief Justice Warren, with whom, on this issue, Justices Black, Douglas, Brennan and White concurred, held that the New York Times test of "actual malice” is applicable to "public figures” as well as to "public officials.”
The extension of the New York Times rule reached its outer limit in Rosenbloom v Metromedia (403 US 29). In that case, the court was even further fractionalized; the opinion of the court commanded the support of only three Justices. Mr. Justice Brennan, speaking also for Chief Justice Burger and Mr. Justice Blackmun, concluded that (pp 43-45):
"If a matter is a subject of public or general interest, it cannot suddenly become less so merely because a private individual is involved, or because in some sense the individual did not 'voluntarily’ choose to become involved. The public’s primary interest is in the event; the public focus is on the conduct of the participant and the content, effect, and significance of the conduct, not the participant’s prior anonymity or notoriety * * *
"We think the time has come forthrightly to announce that the determinant whether the First Amendment applies to state libel actions is whether the utterance involved concerns an issue of public or general concern, albeit leaving the delineation of the reach of that term to future cases.”
And, finding no proof of "actual malice,” the court affirmed the lower court’s dismissal of a libel action brought by a private individual arrested during an obscenity raid, who had complained of statements made during a radio news report of the police action.
Mr. Justice Black concurred "in the judgment,” although he reiterated his position that "the First Amendment does not permit the recovery of libel judgments against the news media even when statements are broadcast with knowledge they are false” (p 57). Mr. Justice White concurred "in the judgment” on the ground that the broadcast, as a report of official police *683 activity, was privileged even though it referred to a private individual involuntarily involved. Justices Harlan, Stewart and Marshall dissented.
The Supreme Court’s most recent journey into the "quagmire” (Curtis Pub. Co. v Butts, 388 US 130, 171, supra [Black, J., dissenting]), is Gertz v Robert Welch, Inc. (418 US 323, supra), upon which plaintiffs here rely. There, too, the decision was reached by a tenuous majority. Four Justices subscribed to the opinion of the court, and Mr. Justice Blackmun, although noting that "I sense some illogic” in the court’s opinion (p 353), concurred, saying: "If my vote were not needed to create a majority, I would adhere to my prior view. A definitive ruling, however, is paramount” (p 354).
This bare majority, per Mr. Justice Powell, held (pp 345-347): "that the States should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual. The extension of the New York Times test proposed by the Rosenbloom plurality would abridge this legitimate state interest to a degree that we find unacceptable * * * We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual.”
Thus, in the wake of Gertz, Federal constitutional guarantees mandate a qualified privilege for defamatory statements about a "public official,” or a "public figure,” but leave to the several States the power to determine standards for imposition of liability for defamation of a "private individual,” so long as the States require proof at least of negligence by the publisher.
In the instant case, defendants first argue that plaintiffs are "public figures,” and that the statements complained of were therefore privileged under Butts and Gertz.
Upon the papers submitted, the court is unable to conclude that, as a matter of law, plaintiffs are "public figures.” They are not generally renowned, as was the plaintiff in Butts, nor did they "thrust * * * [themselves] into the Vortex’ of the controversy” as did the plaintiff in Walker (388 US 130, 146, supra). As the Gertz court said: "Hypothetically it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most *684 part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment” (supra, p 345). Plaintiffs have not been shown to fit this definition. And plaintiff Small’s consent to be interviewed twice for news broadcasts may not be termed, as a matter of law, a "thrust * * * to the forefront” of a "public controversy” concerning computer training schools.
Having determined that, for purposes at least of this motion, plaintiffs are "private individuals,” there remains the question of the applicable standard of behavior to be imposed upon defendants under New York law.
Plaintiffs contend that, inasmuch as the Gertz decision declared the New York Times rule inapplicable to private individuals, the law to be applied here is New York law preNew York Times, which provided a test of "fair comment” (see Bingham v Gaynor, 203 NY 27 [1911]). This argument, however, misconceives the holding of Gertz. Gertz did not overrule New York Times; rather it merely overturned the pronouncement in Rosenbloom that the Federal Constitution requires extension of New York Times to matters of public interest, even if concerning private individuals. And to the extent that the various States may have, as a matter of State law, so extended the New York Times rule, those extensions remain unaffected by Gertz. The court, therefore, is not now required to disregard the post-Afew York Times development of New York law, but only cases decided in blind obeisance to the mandate of Rosenbloom.
The New York cases immediately following the watershed decision in New York Times limited its application to public officials (Dempsey v Time, 43 Misc 2d 754; Youssoupoff v Columbia Broadcasting System, 48 Misc 2d 700; Faulk v Aware, 14 NY2d 899, mot to amend remittitur granted 14 NY2d 954). Although, in Gilberg v Goffi (21 AD2d 517, affd 15 NY2d 1023), the Appellate Division, Second Department, while relying at least in part on its finding that "plaintiff has failed to establish that he had been personally vilified” (p 525), nevertheless stated (p 526): "Nor is it of any avail to plaintiff *685 to claim that he was not a candidate for any public office and that he was outside the political arena. Obviously the law firm, of which he was a member, had generated the public issue on which the defendant made comment. In our opinion, having entered the fray as champion of that law firm, plaintiff made himself as much a part of the local political campaign as did his law partner, the Mayor. It would be anomalous to hold that the Mayor, as a public office holder, was precluded by the New York Times case from suing in libel on a conflict of interest issue affecting his law firm, but that his law partner was individually free to do so on the same subject matter.”
The first specific expansion of the New York Times rule in this State was in Pauling v National Review (49 Misc 2d 975, affd 27 AD2d 903, affd 22 NY2d 818), in which Mr. Justice Silverman of this court foreshadowed the Butts decision, and held that: "The underlying policy adopted by the Supreme Court in the New York Times case would seem to favor extending the doctrine of that case at least to a private person who has 'thrust himself into the vortex of the discussion of a question of pressing public concern’ ” (49 Misc 2d 975, 978, supra).
Likewise before the decision in Butts, the Appellate Division of this department, while concluding that the issue involved in the specific case before it ("the reaction of an entrepreneur to the antics of a comedian”) did not constitute a "major public issue,” appeared, nevertheless, to intimate that, where an appropriate public issue was involved, "a State law defining libel cannot operate as a deterrent to the constitutionally guaranteed rights of free speech and a free press” (Mason v Sullivan, 26 AD2d 115,117 [1st Dept.]).
And, in the aftermath of Butts, but well before Rosenbloom, this court, per Mr. Justice Arthur Markewich, extended the New York Times rule to matters of public interest, even though involving persons other than "public figures.” In All Diet Foods Distrs. v Time (56 Misc 2d 821), defendant published, in its "Life Science Library” volume on "Food and Nutrition,” a chapter entitled "Food Fads and Frauds.”
Immediately adjacent to this title was a photograph of plaintiff’s health food establishment, and plaintiff claimed that this juxtaposition defamed it. The court made no finding that plaintiff was a "public figure”, but held that since "certainly the subject matter of the article under review is of considera *686 ble public interest”, the New York Times privilege applied (p 824) and, there being no showing of actual malice, granted defendant’s motion to dismiss the complaint for legal insufficiency.
Subsequently, in Garfinkel v Twenty-First Century Pub. Co. (30 AD2d 787, 788, app dsmd 22 NY2d 970), the Appellate Division of this department assumed, without need of full explication, that where the subject matter involved in the alleged libel was "of general public interest,” a failure to allege actual malice rendered the complaint fatally defective. Mr. Justice McGivern dissented because the plaintiff was not a "public figure” (p 788).
And in subsequent pre-Rosenbloom decisions, other courts in this State held the New York Times rule applicable to matters of general public interest, even if the alleged victim could not be classified as a "public figure” (Fotochrome v New York Herald Tribune, 61 Misc 2d 226 [Sup Ct, Queens County, 1969]; Lloyds v United Press Int. 63 Misc 2d 421 [Sup Ct, N. Y. County, 1970]; Cohen v New York Herald Tribune, 63 Misc 2d 87 [Sup Ct, Kings County, 1970]). There is, accordingly, ample justification for the statement that "New York courts also held, even before Rosenbloom, that communications involving matters of public concern must fall within the protection of the New York Times privilege” (Schwartz v Time, 71 Misc 2d 769, 771 [Culkin, J.]).
Moreover, in a post-Rosenbloom decision, a unanimous Court of Appeals, by Chief Judge Fuld, appeared not so much to bow before the mandate of Rosenbloom as to adopt its reasoning (Trails West v Wolff, 32 NY2d 207 [1973]).
In this court’s view the impact of these precedents is not diluted by Gertz. Indeed, pursuant to the authority given it by Gertz, this State ought now reaffirm their reasoning and conclusions (cf. Safareis v Gannett Co., 80 Misc 2d 109).
The primary consideration underpinning New York Times and its progeny is a balancing between the constitutional mandate of freedom of the press, and the need to protect innocent persons from damage caused by false accusations. In New York Times, the Supreme Court made the basic determination that, at least with respect to public officials, the public’s need to know, and the media’s need to innocently publish without fear of economic disaster, requires that indemnification for misstatements be limited to those made with knowledge of falsity or reckless disregard for truth or falsity.
*687 But, in subsequent decisions, that court, and the courts of this State, have recognized that the protection of an innocent press ought to depend not upon the identity of the persons involved, but upon the public interest in the subject matter of the publication. This court agrees that: "drawing a distinction between 'public’ and 'private’ figures makes no sense in terms of the First Amendment guarantees. The New York Times standard was applied to libel of a public official or public figure to give effect to the Amendment’s function to encourage ventilation of public issues, not because the public official has any less interest in protecting his reputation than an individual in private life” (Rosenbloom v Metromedia, 403 US 29, 45-46, supra). And, perhaps even more importantly: "the vital needs of freedom of the press and freedom of speech persuade us that allowing private citizens to obtain damage judgments on the basis of a jury determination that a publisher probably failed to use reasonable care would not provide adequate 'breathing space’ for these great freedoms. Reasonable care is an 'elusive standard’ that 'would place on the press the intolerable burden of guessing how a jury might assess the reasonableness of steps taken by it to verify the accuracy of every reference to a name, picture or portrait.’ * * * Fear of guessing wrong must inevitably cause self-censorship and thus create the danger that the legitimate utterance will be deterred” (Rosenbloom, supra, p 50).
This Nation has but recently experienced events which dramatically prove that the press must be free from such self-censorship. Were it not for a press unafraid to publish matters of public interest although there be risk of innocent error, and unafraid that in some manner a private individual might be the subject of innocent misstatement, the most significant saga of official corruption in our history might never have been told, and its wound to our national institutions never cauterized. So long as the media act in good faith, they must remain free to report on matters of public interest, without regard to whether the persons involved in those matters are public officials, public figures or private individuals.
Accordingly, this court concludes that publications which concern matters of public interest — and those involved here unquestionably do — are subject to a qualified privilege and are actionable only upon a showing that they were made "with knowledge that * * * [they were] false or with reckless disre *688 gard of whether * * * [they were] false or not” (New York Times Co. v Sullivan, 376 US 254, 280, supra).
Plaintiffs do not here seriously contend that defendants had actual knowledge that the statements made were false, but contend that defendants demonstrated a "reckless disregard” for whether they were true or not. Specifically, plaintiffs allege that defendants broadcast statements by the Commissioner of Consumer Affairs out of context, thereby distorting them; that defendants did not corroborate the accuracy of their statements with the State Department of Education, which supervises schools such as plaintiffs’; and that defendants republished the alleged defamatory material in April after plaintiffs advised them of the errors in the December broadcast.
As to the interview with the Commissioner of Consumer Affairs, plaintiffs’ claim is disproved by documentary evidence. Defendants have annexed to their papers the transcript of that interview, as well as a transcript of the complained of broadcast. The broadcast did not distort the comments of the commissioner to plaintiffs’ detriment. Indeed, if anything, defendants published the less unfavorable portions of that official’s statement.
The remaining two contentions, even if true, are insufficient to demonstrate a "reckless disregard” for the truth. The Supreme Court has defined that term as requiring "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication” (St. Amant v Thompson, 390 US 727, 731). Indeed, both in St. Amant and in New York Times, the Supreme Court rejectéd the same claim with respect to lack of sufficient investigation raised here: "Failure to investigate does not in itself establish bad faith” (390 US 727, 733). Moreover, the evidence before the court amply demonstrates a careful research by defendants, and reliance upon statements from reliable government officials having jurisdiction over the subject matter involved. That defendants may not have reconfirmed the facts with every governmental agency with jurisdiction does not constitute "reckless disregard.”
The claim that defendants showed "reckless disregard” in republishing the statements after an alleged warning from plaintiffs has no greater merit. First, the factual assertion that such warning was given has no probatiye value. It is made, not in the affidavit of one with supposed knowledge of *689 the facts, nor even in counsel’s affirmation, but is raised for the first time in an unsworn memorandum of law. As such, it is not entitled to consideration by the court (Di Sabato v Soffes, 9 AD2d 297).
In any event, this allegation, that prior to the April broadcast, "plaintiff Small notified defendants that the December broadcast was grossly inaccurate”, is insufficient to raise an issue of "reckless disregard.” The undisputed documentary evidence submitted demonstrates that defendants based their broadcast statements in large measure upon the information given them by government sources, notably the office of the Attorney-General of the State of New York, the Commissioner of Consumer Affairs of the City of New York, and, with respect to the April broadcast, the Federal Trade Commission. The information gleaned from these official sources was fairly reflected in the challenged statements. Thus, even assuming that plaintiffs sufficiently alleged that plaintiff Small advised defendants that the December report was "grossly inaccurate,” "the defendants were certainly entitled to accept the word of officials charged with responsibility for * * * [investigating complaints about computer training schools] rather than the pleas and threats of interested parties” (Trails West v Wolff 32 NY2d 207, 220, supra).
In sum, the allegations of this case constitute a far cry from those of St. Amant, in which the Supreme Court found a lack of "reckless disregard” despite facts showing "that St. Amant had broadcast false information about Thompson * * * [and]: (1) St. Amant had no pérsonal knowledge of Thompson’s activities; (2) he relied solely upon an individual’s affidavit, although there was no evidence of that person’s reputation for veracity; (3) he failed to verify his information with those who might have known the facts; and (4) he gave no consideration to whether or not his statements defamed plaintiff and went ahead heedless of the consequences” (Adey v United Action for Animals, 361 F Supp 457, 463 [SONY, 1973], affd 493 F2d 1397 [2d Cir, 1974], cert den 419 US 842).
This court accordingly concludes that plaintiffs’ allegations of actual malice, in their complaint, and in opposition to this motion, are insufficient, and fail to raise triable issues of fact. Under the circumstances, summary judgment dismissing the complaint is the appropriate remedy (Shapiro v Health Ins. Plan of Greater, N. Y., 7 NY2d 56; Schneph v New York Post Corp., 16 NY2d 1011; Cole Fisher Rogow, Inc. v Carl Ally, Inc. *690 25 NY2d 943; Twenty-Five East 40th St. Rest. Corp. v Forbes, 30 NY2d 595; Trails West v Wolff, 32 NY2d 207, 219-222, supra; Silbowitz v Lepper, 55 Misc 2d 443, affd 32 AD2d 520; Steak Bit of Westbury v Newsday, 70 Misc 2d 437).
Finally, the court commends counsel for both sides for their scholarly discussion of the issues presented in this difficult case.
The motion for summary judgment is in all respects granted.