W. T. CARSON, Jr., Plaintiff,

v.

SOUTHERN RAILWAY COMPANY,
Defendant.

Civ. A. No. 79–82.

United States District Court,
D. South Carolina,
Greenville Division.

Sept. 27, 1979.

W. T. Carson, Jr., pro se.

Frank H. Gibbes, III, of Rainey, Britton, Gibbes & Clarkson, P. A., Greenville, S. C., for defendant.

## ORDER

HEMPHILL, District Judge.

This matter is before the Court on two motions filed by the defendant, Southern Railway Company. The first motion is a motion, pursuant to Rule 12(d) of the Federal Rules of Civil Procedure, for a hearing and determination on its previously asserted Rule 12(b)(1) defense that the Court lacks jurisdiction over the subject matter of this lawsuit; the second is a motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment in its favor.

This action was initially commenced in the Circuit Court of the State of South Carolina on or about December 27, 1978 and was thereafter removed to this Court by the defendant, Southern Railway Company, on or about January 12, 1979. In pertinent part the complaint filed on behalf of the plaintiff alleges:

## II

That the Plaintiff was at all times relevant hereto an employee of the Defendant corporation. That on or about September 20, 1978, the Plaintiff was at the Defendants Southern Railway Yard at the County of Greenville, State of South Carolina, pursuant to his contract of employment. That the Plaintiff was accused by an agent and servant of the Defendant with being drunk while on duty. That said accusation was untrue and was made in front of friends of the Plaintiff and other employees of the company. . . . . . .

## III

That the above statements were uttered by the agents and servants of the Defendant with malice. That as a result of the above, the Plaintiff has undergone extreme embarrassment, has become emotionally upset, has suffered mental indignities, and has been terminated from his employment with Southern Railway System, and is subject to ridicule that his reputation has been lowered in the business community in which he works and the community in which he lives.

In its answer Southern admitted that its supervisor charged the plaintiff with a violation of Southern Railway Company Operating Rule G (which subjects an employee who uses or is under the influence of alcohol or certain other substances while on duty to dismissal or discipline) but denied that the charge was made in the presence. of anyone other than the plaintiff. Southern further asserted, among other defenses, the defenses of lack of jurisdiction over the subject matter, absolute privilege, and qualified privilege.

On March 14, 1979 Southern took extensive deposition testimony from the plaintiff. Thereafter, on June 12, 1979, Southern served the two motions which are now before the Court together with supporting affidavits and a brief in support of its motions.

Through this point in these proceedings the plaintiff was duly represented by counsel. However, at or about the time Southern served the two motions which are now before the Court, certain irreconcilable differences arose between the plaintiff and his attorney which resulted in the plaintiff's attorney filing a motion to be relieved as counsel of record for the plaintiff in this action on or about June 19, 1979.

On July 5, 1979 a hearing was held on this motion. The plaintiff was present at the hearing and stated that he had no objection to his counsel being relieved so long as he was afforded a reasonable period of time to secure substitute counsel. After inquiring of the plaintiff as to the time he might need to secure substitute counsel and

cautioning the plaintiff about the technical nature of the defenses asserted by Southern and the urgency of filing a proper response to Southern's motions, this Court issued its order granting the plaintiff 40 days in which to secure substitute counsel and file a memorandum in opposition to Southern's motions. At the time this Court further indicated its willingness to entertain an appropriate motion for additional time if the plaintiff's new attorney found that such additional time was necessary in order to properly respond to Southern's motions.

On August 23, 1979 a notice was issued by the Clerk of Court advising both parties to this suit that a hearing on Southern's pending motions would be held by this Court on September 10, 1979. The notice stated: "MR. CARSON: Please give this notice to your attorney, if you have obtained one since being directed to do so by the Court's order filed July 5, 1979."

The hearing on Southern's pending motions was held before me on September 10, 1979. The plaintiff appeared without counsel and advised the Court that he had not retained an attorney since the July 5 hearing. Southern was represented at the hearing by its counsel, Frank H. Gibbes, III of the law firm of Rainey, Britton, Gibbes & Clarkson, P.A.

This Court is mindful of its responsibility to assure that all litigants are treated fairly and are accorded equal justice under the law. This Court is ever more mindful of its responsibility in this regard where a party to a lawsuit appears pro se and without the benefit of trained and learned counsel so necessary to the conduct of litigation such as that now before the Court.

Accordingly, prior to the hearing held on September 10, 1979, the Court reviewed the record in this case more thoroughly than it might ordinarily be called upon to do. Further, at the hearing held on September 10, the Court took several specific steps to assure that the absence of counsel did not deprive the plaintiff of any right he might otherwise have in this matter: First, the Court assured itself that lack of sufficient time had not precluded the plaintiff from securing substitute counsel; second, the Court advised the plaintiff in clear and concise terms of his burden of proving that the allegedly slanderous remark was published to a third person; and, third, the Court reviewed the critical parts of the plaintiff's deposition testimony with him to assure that the plaintiff's answers to questions propounded by Southern's counsel fully and fairly reflected all the evidence the plaintiff might be able to offer in support of his action.

Being satisfied that the plaintiff's rights have been fully protected and having carefully reviewed both the facts and the law which apply in this matter, this Court must conclude that Southern's motion to dismiss and its motion for summary judgment are meritorious and should be granted. While the Court's decision to grant Southern's motion to dismiss for lack of subject matter jurisdiction would ordinarily make inquiry into Southern's motion for summary judgment unnecessary, the Court, in a continuing effort to protect the plaintiff's rights, has fully advised the plaintiff concerning his right to appeal from this order; recognizing that an appeal may be taken, this Court believes that it is in the best interest of both parties that the Court issue its alternative ruling disposing of Southern's motion for summary judgment.

The facts of this case, gleaned largely from the plaintiff's deposition testimony, are clear and not in dispute.

The plaintiff had worked for Southern as a conductor since 1945. As a conductor, Carson acted as the chief of a rail yard crew composed of an engineer and two (2) switchmen.

On September 30, 1978 Carson reported to work at Southern's Greenville rail yard around 3:00 p. m. or a little thereafter to act as a conductor for a crew assigned to the north yard. Before Carson could report to the yard master to get his instructions, James L. Gurkin, the plaintiff's supervisor, drove up in a crew cab with all the members of the plaintiff's crew ready to begin work. Gurkin told Carson that he would drive him and his crew up to the north

yard, and, after Carson boarded the cab behind Gurkin, the entire group proceeded directly to the north yard.

When they arrived at the north yard, Gurkin instructed Carson to take an engine to the diesel yard. Carson and his crew then walked along the track about 200 yards and boarded the engine. By this time Gurkin had noticed that Carson's eyes appeared to be red and blood shot, and he also noticed that Carson seemed to be having difficulty comprehending instructions. Moreover, Gurkin smelled a strong odor of mouthwash or some type of mint on Carson's breath. Then, as Carson and his crew walked some 200 yards along the track to the diesel engine they were to move, Gurkin noticed that Carson appeared to be staggering and stumbling. Based on his observations of Carson, Gurkin believed that Carson might be intoxicated and that his condition was such that he could not safely perform his normal duties. Gurkin accordingly determined that Carson should be charged with violating Southern's Operating Rule G, which prohibits intoxication and the use of alcohol while on duty.[1]

When Gurkin actually charged Carson with violating Rule G, Gurkin and Carson were the only people present. Gurkin approached Carson while he was sitting in the diesel engine next to the engineer and called him down off the engine. The rest of the crew remained on the engine while Gurkin and Carson walked a considerable distance away; only then did Gurkin charge Carson with a violation of Rule G. Gurkin also told Carson that he was being relieved of his duties and notified the yard master, but Gurkin did not inform the yard master of the reason for Carson's suspension.

At this point Carson asked to return to the engine to inform his crew of his suspen-sion, but Gurkin instructed him not to return to the crew. Gurkin and Carson then walked back to the crew cab, and, along the way, they met a track supervisor, Bobby Rader. Carson told Rader that he wanted Rader to be his witness to the fact that Gurkin had charged him with violating Rule G. Gurkin simply stated that Carson did not need a witness.

After this brief encounter, Carson got in the crew cab and went to the office of Southern's physician to have a blood test performed. The physician's office was closed, however, so the test was performed at Greenville General Hospital by one of the nurses or technicians. While at the hospital for this test, Carson did not see anyone that he knew.

About 4:30 or 5:00 p. m. Gurkin and Carson returned to the rail yard. Although Carson had been relieved of his duties, before he left the yard, Carson informed his crew that he had been charged with violating Rule G. This is the first they knew of the charge.

In accord with the provisions of the collective bargaining agreement then in effect between Southern and the United Transportation Union (Carson's union), a hearing was scheduled for October 4, 1978 on the charge that Carson had violated Rule G. Sidney E. Hawkins, the superintendent of Southern's operations in Greenville, sent Carson a letter, dated October 2, 1978 advising him to appear at the investigation on October 4 and informing him of the specific charge against him.

This formal notice was issued pursuant to Article 44 of the collective bargaining agreement between Southern and the UTU, the pertinent portions of which appear below:

1. The plaintiff was accused of violating Rule G, which is one of Southern's operating rules. The entire text of this rule, as it appears in the Southern Railway Rule Book is as follows:

An employee who reports for duty under the influence of alcohol or other intoxicant, an amphetamine, a narcotic drug, a hallucinogenic drug, or a derivative or combination of any of these, or who uses any of the foregoing while on duty, will be dismissed. Use of or being under the influence of any of the foregoing while on Company property or equipment is cause for discipline.

The plaintiff acknowledges in his deposition testimony that the rule is intended to promote on–the–job safety. He also acknowledges that Gurkin's duty as a supervisor is to enforce compliance with company operating rules, including Rule G.

INVESTIGATIONS AND DISCIPLINE

(a) A yardman will not be disciplined without being given a fair and impartial investigation by proper officer of the Company. He will be notified, in writing, the reason for the investigation, which shall be held within seven (7) days, if practicable. He will have the privilege of bringing to the investigation one or more representatives of his own selection, provided such representatives are employees in good standing. He and his representatives will have the privilege of hearing all evidence submitted and interrogating all witnesses.

(b) If found blameless, he will be paid for time lost. If discharged or demerited, he will be so advised, in writing, within fifteen (15) days.

(c) When discipline is applied, copy of the investigation will be furnished the employee disciplined and the Local Chairman, if requested in writing.

On October 3 Southern learned that the results of the blood alcohol test were negative and cancelled the hearing scheduled for October 4. Hawkins then sent Carson a letter dated October 5, 1978, advising him that the investigation on the Rule G charge had been cancelled. Meanwhile, Carson had also learned that the blood alcohol test results were negative.

Hawkins' letter of October 5 not only cancelled the Rule G investigation but also instructed Carson to report for a medical examination to determine his continued fitness to remain in service. Carson received this letter on October 10. On that same day Gurkin also spoke with Carson and told him that he would have to have a physical examination before returning to work even though the Rule G charge had been cancelled. Carson replied that he would have a physical examination at his convenience after the Rule G charge was settled. Carson explained his position to be that the Rule G charge had been dropped but it had not been settled because he had not been advised as to why the charge was dropped.

Hawkins' instructions to Carson to report for a physical examination were issued pursuant to the provisions of Article 40 of the agreement between Southern and the UTU. Article 40 provides in pertinent part:

In connection with instructions given by the Carriers as to physical examinations, it is agreed between representatives of the Companies named below and representatives of the United Transportation Union, as follows:

That employees of said Companies represented by the said Organization may be required to report for physical examinations to a physician of the Company's choosing upon being given written notice so to do by a proper official. Examinations as a matter of routine will not be held more often than once a year; this shall not, however, prevent special examinations at more frequent intervals, if, in the judgment of Management, such examinations be necessary, nor shall it prevent periodical examinations at more frequent intervals if required by the physician.

The remainder of Article 40 sets forth detailed procedures for the conduct of the examination and sets forth the respective rights of the carrier and the employee with respect to the examination.

In spite of being instructed to report for a physical examination, Carson failed to do so, and, as a consequence, he was discharged on December 5, 1978, for failing to obey the instructions to report for a physical examination. On that same day Superintendent Hawkins wrote Carson a letter notifying him of his discharge and the reason therefor.

MOTION TO DISMISS

In its answer Southern asserts, by way of defense, that this Court lacks jurisdiction of the subject matter of the plaintiff's complaint because the plaintiff has failed to exhaust his administrative, arbitral remedies and because the plaintiff's alleged cause of action is in essence and substance an employment grievance arising under an applicable collective bargaining agreement and the Railway Labor Act and is, there-

fore, solely within the jurisdiction of the National Railroad Adjustment Board or a special board of adjustment. By its first motion now pending before the Court, Southern seeks a determination of this issue. Southern's motion is, for all practical purposes, a motion to dismiss, and this Court will so treat it.

Section 3 First (i) of the Railway Labor Act, as amended, 45 U.S.C.A. § 153 First (i), provides:

> The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, including cases pending and unadjusted on June 21, 1934, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this matter, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

Section 3 First (q) of the Railway Labor Act, as amended, 45 U.S.C.A. § 153 First (q), further provides:

> If any employee or group of employees, or any carrier, is aggrieved by the failure of any division of the Adjustment Board to make an award in a dispute referred to it, or is aggrieved by any of the terms of an award or by the failure of the division to include certain terms in such award, then such employee or group of employees or carrier may file in any United States District Court in which a petition under paragraph (p) could be filed, a petition for review of the division's order. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Adjustment Board. The Adjustment Board shall file in the court the record of the proceedings on which it based its action. The court shall have jurisdiction to affirm the order of the division or to set it aside, in whole or in part, or it may

remand the proceeding to the division for such further action as it may direct. On such review, the findings and order of the division shall be conclusive on the parties, except that the order of the division may be set aside, in whole or in part, or remanded to the division, for failure of the division to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order. The judgment of the court shall be subject to review as provided in Sections 1291 and 1254 of Title 28.

Section 3 Second of the Railway Labor Act, as amended, 45 U.S.C.A. § 153 Second, further provides in pertinent part:

> If written request is made upon any individual carrier by the representative of any craft or class of employees of such carrier for the establishment of a special board of adjustment to resolve disputes otherwise referable to the Adjustment Board, or any dispute which has been pending before the Adjustment Board for twelve months from the date the dispute (claim) is received by the Board, or if any carrier makes such a request upon any such representative, the carrier or the representative upon whom such request is made shall join in an agreement establishing such a board within thirty days from the date such request is made. . .
> Any two members of the board shall be competent to render an award. Such awards shall be final and binding upon both parties to the dispute and if in favor of the petitioner, shall direct the other party to comply therewith on or before the day named. Compliance with such awards shall be enforcible by proceedings in the United States district courts in the same manner and subject to the same provisions that apply to proceedings for enforcement of compliance with awards of the Adjustment Board.

In order to determine whether the provisions of the Railway Labor Act deprive this Court of subject matter jurisdiction of the

present controversy between the plaintiff and Southern, this Court must address three questions. First, does the Railway Labor Act provide an exclusive remedy for handling a minor dispute arising under an applicable collective bargaining agreement? Second, is the manner in which a plaintiff characterizes his cause of action in his complaint dispositive of the question of whether his claim lies within the exclusive jurisdiction of the Adjustment Board? And, third, is the plaintiff's cause of action here in essence and substance a minor dispute arising under an applicable collective bargaining agreement within the meaning of the Railway Labor Act so as to lie solely within the jurisdiction of the Adjustment Board?

■ The first question—whether the Railway Labor Act provides an exclusive remedy—was addressed and answered affirmatively in unequivocal terms in *Andrews v. Louisville & Nashville Railroad Company*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972). In *Andrews* the railroad and a former employee who had been injured in an automobile accident were involved in a dispute concerning the railroad's obligation to restore the employee to his regular duties following his injury. After the former employee commenced a state court action seeking damages for wrongful discharge, the railroad removed the case to federal court and moved to dismiss the complaint on the ground that the plaintiff failed to exhaust the administrative remedies provided him by the Railway Labor Act.

In affirming the decisions of the District Court and the Fifth Circuit Court of Appeals dismissing the action, the Supreme Court first recognized that an action for damages based on wrongful discharge is in fact nothing more than a discharge grievance in which the employee is seeking a remedy other than reinstatement. In view of this the Court affirmed that the employee's wrongful discharge claim was in actuality a minor dispute within the meaning of the Railway Labor Act, 45 U.S.C.A. § 153 First (i), which provides a grievance and arbitration procedure for "disputes between

an employee . . . and a carrier . . . growing out of grievances or out of interpretation or application of agreements concerning rates of pay, rules, or working conditions. . . ." In so ruling, the Court noted that the only source of the plaintiff's right, if any, to treat his discharge as wrongful and actionable was the collective bargaining agreement between his employer and his union. 406 U.S. at 323–24, 92 S.Ct. at 1564–1565, 32 L.Ed.2d at 99.

Having determined that the plaintiff's claim was in actuality an employee grievance or minor dispute within the meaning of the Railway Labor Act, the Court next addressed the question of whether such minor disputes are subject to mandatory arbitration. In addressing this issue, the Court relied on its prior decision in the case of *Walker v. Southern Railway Company*, 385 U.S. 196, 87 S.Ct. 365, 17 L.Ed.2d 294 (1966) where the Court observed:

> Provision for arbitration of a discharge grievance, a minor dispute, is not a matter of voluntary agreement under the Railway Labor Act; the Act compels the parties to arbitrate minor disputes before the National Railroad Adjustment Board established under the Act.

*Andrews*, 406 U.S. at 322, 92 S.Ct. at 1564, 32 L.Ed.2d at 98, *quoting from Walker*, 385 U.S. at 198, 87 S.Ct. at 366, 17 L.Ed.2d at 297. In reaffirming that mandatory arbitration of an employment grievance arising under an applicable collective bargaining agreement is required by the terms of the Railway Labor Act, the Court stated:

> Thus, the notion that the grievance and arbitration procedures provided for minor disputes in the Railway Labor Act are optional, to be availed of as the employee or the carrier chooses, was never good history and is no longer good law.

*Andrews*, 406 U.S. at 322, 92 S.Ct. at 1564, 32 L.Ed.2d at 98.

After determining that the plaintiff's claim constituted a minor dispute and that such minor disputes are subject to mandatory arbitration under the Railway Labor Act, the *Andrews* court finally addressed the issue of whether the Railway Labor Act, in

addition to requiring that an employee first exhaust his administrative remedies, in effect prescribes an exclusive remedy which precludes an employee from relitigating matters handled on the merits before an adjustment board in an independent judicial proceeding. In deciding that the Railway Labor Act prescribes such an exclusive remedy, the Court reasoned:

The term 'exhaustion of administrative remedies' in its broader sense may be an entirely appropriate description of the obligation of both the employee and carrier under the Railway Labor Act to resort to dispute settlement procedures provided by that Act. It is clear, however, that in at least some situations the Act makes the federal administrative remedy exclusive, rather than merely requiring exhaustion of remedies in one forum before resorting to another. A party who has litigated an issue before the Adjustment Board on the merits may not relitigate that issue in an independent judicial proceeding. *Union Pacific R. Co. v. Price,* 360 U.S. 601, 79 S.Ct. 1351, 3 L.Ed.2d 1460 (1959). He is limited to the judicial review of the Board's proceedings that the Act itself provides. *Gunther v. San Diego & A. E. R. Co.,* 382 U.S. 257, 86 S.Ct. 368, 15 L.Ed.2d 308 (1965). In such a case the proceedings afforded by 45 U.S.C. § 153 First (i), will be the only remedy available to the aggrieved party.

406 U.S. at 325, 92 S.Ct. at 1565, 32 L.Ed.2d at 100. *See also, Dorsey v. Chesapeake & Ohio Railway Co.,* 476 F.2d 243, 245 (4th Cir. 1973) and *Hill v. Southern Railway Company,* 402 F.Supp. 414, 416–18 (W.D.N. C.1975).

■ In considering Southern's motion to dismiss, the second question which this Court must address is the question of whether the plaintiff's characterization of his cause of action in his complaint is dispositive of the question of whether the claim is a minor dispute subject to mandatory arbitration and lying within the sole and exclusive jurisdiction of the Adjustment Board. In determining that this question should be answered in the negative, the Court is persuaded by the well

reasoned opinion of the Court of Appeals in the case of *Magnuson v. Burlington Northern, Inc.,* 576 F.2d 1367 (9th Cir. 1978), cert. den., 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). *Magnuson* involved a train dispatcher who brought an action for intentional infliction of emotional distress against the railroad after he was discharged from his employment with the railroad for his part in a head-on collision between two freight trains which resulted in injuries and fatalities. 576 F.2d at 1368–69.

Although the plaintiff characterized his action in his complaint as one for intentional infliction of emotional distress, the Court, looking beyond the face of the complaint, determined that the dispatcher's primary complaint was one for alleged wrongful discharge. The Court concluded, therefore, that the plaintiff's claim was in reality and substance an employee grievance or minor dispute within the meaning of the Railway Labor Act subject to mandatory arbitration before the National Railroad Adjustment Board. 567 F.2d at 1369–70.

In deciding that the plaintiff's characterization of his claim as one for common law tort should not control, the Court reasoned:

Every employee who believes he has a legitimate grievance will doubtless have some emotional anguish occasioned by his belief that he has been wronged. Artful pleading cannot conceal the reality that the gravamen of the complaint is wrongful discharge. If the pleading of emotional injury permitted the aggrieved employees to avoid the impact of the R.L.A., the congressional purpose of providing a comprehensive federal scheme for the settlement of employer-employee disputes in the railroad industry, without resort to the courts, would be thwarted.

576 F.2d at 1369. *See also, Dolphin v. Louisville & Nashville Railroad Company,* No. 78–3308 (M.D.Tenn. filed Dec. 28, 1978), *Coleman v. Louisville & Nashville Railroad Company,* No. 78–3192 (M.D.Tenn. filed January 8, 1979), and *Louisville & Nashville Railroad Company v. Marshall,* 586 S.W.2d 274 (Ky.App.1979) (each of which involved

an action characterized as one for defamation where the court ultimately determined that the claim, rather than being one for defamation, was in fact a minor dispute subject to mandatory arbitration and lying solely within the jurisdiction of the National Railroad Adjustment Board).

■ In considering Southern's motion to dismiss, the third question which the Court must consider—unfettered by the plaintiff's characterization of his claim as one for slander—is the question of whether the plaintiff's claim is in essence and substance a minor dispute arising under an applicable collective bargaining agreement so as to be within the exclusive jurisdiction of the Adjustment Board and require dismissal of this action. Upon the evidence presented, this Court is of the opinion that this question must be answered affirmatively and that this action must, accordingly, be dismissed.

In the first place, the plaintiff's claim evolved out of a dispute between the plaintiff and his employer as to the proper application of Southern's Operating Rule G. Such disputes clearly fall within the intendment of Section 3 of the Railway Labor Act which provides for the resolution of "disputes between an employee . . . and a carrier . . . growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions. . . ." 45 U.S.C.A. § 153 First (i).

In the second place, from a review of the plaintiff's deposition testimony and examination of the plaintiff at the time of the hearing held before this court on September 10, 1979, it is clear that the plaintiff's complaints arising out of this matter extend far beyond the allegedly slanderous remark and involve questions the resolution of which will require interpretation and construction of the collective bargaining agreement in effect at the time of this incident between Southern and the plaintiff's union. For example, the plaintiff complains about the handling of the Rule G charge against him which involves construction and application of Article 44 of the Collective Bargaining Agreement; the plaintiff complains that he was not properly notified of the investigation concerning his failure to take the physical examination which likewise involves interpretation of Article 44 of the agreement; and the plaintiff complains that he was wrongfully discharged for his failure to take a physical examination which involves construction and interpretation of Article 40 of the Collective Bargaining Agreement between Southern and the plaintiff's union.

Finally, in determining whether the plaintiff's claim is in essence and substance a minor dispute within the meaning of the Railway Labor Act, this Court deems it proper to inquire into the record to see whether the plaintiff can otherwise sustain his burden of proving a cause of action for the common law tort of defamation. After a thorough review of the record in this case, this Court is convinced that there is no evidence in the record which would enable the plaintiff to sustain his burden of showing that Southern published the allegedly slanderous remark to a third person. This conviction only serves to reinforce the Court's conclusion that the plaintiff's claim is in essence and substance a minor dispute within the meaning of the Railway Labor Act.

By way of summary, this Court concludes that the plaintiff's claim is in essence and substance an employment grievance, or a minor dispute, arising under an applicable collective bargaining agreement. As such, the plaintiff's claim lies solely within the jurisdiction of the National Railroad Adjustment Board (or a special board of adjustment), and the plaintiff is without an independent judicial remedy. Accordingly, this Court must conclude that it lacks subject matter jurisdiction of the plaintiff's claim and that Southern's motion to dismiss must be granted.

## MOTION FOR SUMMARY JUDGMENT

Southern's second motion is a motion for summary judgment pursuant to the provisions of Rule 56 of the Federal Rules of Civil Procedure. Rule 56(c) provides that summary judgment "shall be rendered

forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

■ Southern's motion for summary judgment is made, in the first instance, on the grounds that there is no evidence that the allegedly slanderous statement was published to a third person. In an action for defamation, whether slander or libel, the plaintiff has the burden of proving as a necessary element of his cause of action that the allegedly defamatory statement was published to a third party. *Kendrick v. Citizens & Southern National Bank*, 266 S.C. 450, 454, 223 S.E.2d 866, 868 (1976); *Neely v. Winn-Dixie Greenville, Inc.*, 255 S.C. 301, 306–08, 178 S.E.2d 662, 665–66 (1971); Prosser, *Law of Torts* § 111 (4th Ed.1971). In an action for slander the plaintiff's failure to prove that the allegedly slanderous statement was published to a third person is fatal to his cause of action. And, similarly, where the plaintiff in an action for slander faced with a motion for summary judgment is unable to produce sufficient competent evidence to create an issue of fact as to whether the allegedly slanderous statement was published to a third person or not, the moving party is entitled to have judgment entered in his favor as a matter of law.

■ In support of its motion for summary judgment Southern filed an affidavit from its superintendent of terminal, James L. Gurkin. In his affidavit Gurkin states:

7. He asked Carson to join him in an area where no other persons were present and no other persons were within earshot, and he informed Carson that Carson was being relieved of his duties, that he suspected Carson was in violation of Rule G, and that he would give Carson an opportunity to have a blood test.

Affidavit of James L. Gurkin dated June 12, 1979, page 1.

The statement contained in Gurkin's affidavit to the effect that no one else was present when he charged the plaintiff with a violation of Rule G is confirmed by the testimony which the plaintiff himself gave during the course of his deposition. During the plaintiff's deposition the following exchange took place:

Q. All right. So when Mr. Gurkin made this statement to you that he was charging you with a violation of Rule G, you and he were the only two people there.

A. That's true.

Deposition of W. T. Carson, Jr., plaintiff, page 24, line 6–9.

At the hearing held on September 10, 1979, the Court examined the plaintiff carefully concerning the deposition testimony set forth above. The plaintiff confirmed the accuracy of his deposition testimony and reiterated that no other persons were present when Gurkin charged him with a violation of Southern's Operating Rule G.

Based upon the clear and undisputed evidence in the case—and, in particular, on the plaintiff's own testimony—this Court must conclude that there is no evidence in the case even to suggest that the allegedly slanderous statement was published to a third person. As such, the plaintiff's cause of action for slander must fail, and Southern is entitled to judgment in its favor as a matter of law.

■ At the hearing held on September 10 the plaintiff suggested that the requirement of a publication might be met by the exchange which took place between a track supervisor by the name of Bobby Rader, Gurkin, and himself. In his deposition testimony the plaintiff describes this exchange in the following language:

Q. All right. Where did you see him?

A. Right before we got in the crew cab.

Q. He was working or doing something along in that area?

A. He's a track supervisor. I said to him, I said Bobby, I want you to be my witness. Mr. Gurkin has got me with Rule G. Mr. Gurkin said you don't have to have a witness.

Q. All right. Did Mr. Gurkin say anything else in Mr. Rader's presence?

A. No.

Q. All right. Did Mr. Rader say anything?

A. No, he didn't say anything.

Deposition of W. T. Carson, Jr., plaintiff, page 25, line 5–15.

At the September 10 hearing the plaintiff confirmed the accuracy of his deposition testimony and reaffirmed that he, rather than Gurkin, precipitated this exchange. As such, evidence of this exchange can be of no avail to the plaintiff in his effort to show that Southern published the allegedly slanderous statement to a third person. As one authority has stated, "The defendant is not liable for any publication made to others by the plaintiff himself, even though it was to be expected that he might publish it." Prosser, *Law of Torts*, § 113 (4th Ed. 1971). Or, as the South Carolina Supreme Court, considering a case where the plaintiff himself published an allegedly libelous letter received from the defendant, said: "His act on his part cannot be visited on the defendant. He himself published the defendant's slander and must bear the consequences of his folly." *Fonville v. McNease*, 23 S.C.L. (Dud.) 303, 312 (1838).

For the foregoing reasons, this Court is of the opinion that there is no genuine issue as to any material fact and that Southern is entitled to have its motion for summary judgment granted as a matter of law. Because of this ruling, the Court does not deem it necessary to consider the additional grounds of absolute privilege and qualified privilege advanced by Southern in support of its motion.

AND IT IS SO ORDERED.