John V. MILAM and Vivian Milam, Plaintiffs,

v.

Dr. John HERRLIN, as an Agent of Metro–North Commuter Railroad, Rose Tulli, as an Agent of Metro–North Commuter Railroad, and Metro–North Commuter Railroad, Defendants.

No. 92 Civ. 5320 (RWS).

United States District Court, S.D. New York.

April 7, 1993.

Collins, Collins, DiNardo & Dolce, Buffalo, NY (John F. Collins, of counsel), for plaintiffs.

Metro–North Commuter R. Co., Richard K. Bernard, Gen. Counsel, New York City (C. Sue Barnett, Jose R. Rios, of counsel), for defendants.

## OPINION

SWEET, District Judge.

The defendants, Dr. John Herrlin ("Herrlin"), Rose Tulli ("Tulli"), and Metro–North Commuter Railroad ("Metro–North") (collectively, the "Defendants") have moved pursuant to Rule 12(b)(1) and (6), Fed.R.Civ.P., for an order dismissing the Complaint of plaintiffs John V. Milam ("Milam") and Vivian Milam (collectively, the "Plaintiffs") for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted.

The Plaintiffs have moved pursuant to 28 U.S.C. § 1447 for an order remanding this action to the New York State Supreme Court from which it was removed.

For the reasons set forth below, the Plaintiffs' motion to remand is denied, and the Defendants' motion to dismiss the Plaintiffs' Complaint is granted.

### The Parties

Milam is and was at the time of the drug test about which he complains an employee of Metro–North, working as a tower operator as defined by 45 U.S.C. § 51.

Plaintiff Vivian Milam is Milam's wife.

Metro–North is a corporation duly organized, created, and existing under the laws of the State of New York and is a common carrier in interstate transportation and commerce by railroad.

Herrlin is an employee of Metro–North, serving as its Medical Director and designated Medical Review Officer pursuant to 49 C.F.R. part 40 and 49 C.F.R. § 219.707. Herrlin is sued in his official capacity as an agent of Metro–North.

Tulli is an employee of the Metro–North. She serves as Manager of Metro–North's Random Testing Program and is sued in her official capacity as an agent of Metro–North.

### Prior Proceedings

This action originally was brought by the Plaintiffs in the New York State Supreme Court, New York County, seeking damages pursuant to the Federal Employers' Liability Act, 45 U.S.C. §§ 51 et seq. (the "FELA"). On July 17, 1992, the Defendants removed this action pursuant to 28 U.S.C. §§ 1441 et seq. from that court to the United States District Court for the Southern District of New York with the alleged original and removal jurisdiction of this Court being premised on a claim of right under the Constitution, treaties, or laws of the United States pursuant to 28 U.S.C. §§ 1331, 1337, and 1441 et seq.

The Defendants filed their motion on July 27, 1992, and the Plaintiffs submitted their motion to this Court on August 6, 1992. Oral argument was heard on both motions on November 25, 1992, and they are considered fully submitted as of that date.

### Facts

■ On a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in their favor and against the defendants. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir.1989); Dwyer v. Regan, 777 F.2d 825, 828–29 (2d Cir.1985). Accordingly, the factual allegations considered here and set forth below are taken from

the Plaintiffs' Complaint and do not constitute findings of fact by the Court. They are presumed to be true only for the purpose of deciding the present motions.[1]

In his capacity as a tower operator for Metro–North, Milam is responsible for performing duties involving the movement of freight in interstate and foreign commerce. He is subject to the Hours of Service Act, 45 U.S.C. §§ 61 *et seq.*, which regulates the hours of service of employees "actually engaged in or connected with the movement of any train, including hostlers." 45 U.S.C. § 61(b)(2). The rates of pay, rules, and working conditions of his employment are governed by the collective bargaining agreement (the "Agreement") entered into between Metro–North and the Transportation Communications International Union, which was formed according to and is governed by the provisions of the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.* (the "RLA"). Metro–North's Substance Abuse Policy and Rule G[2] of the Rules of the Operating Department (the "Department"), which restrict an employee's use of alcohol and controlled substances, are deemed by past practice to be part of Metro–North's collective bargaining agreements. *See Railway Labor Executives' Ass'n v. Metro–North Commuter R.R. Co.,* 759 F.Supp. 1019, 1023 (S.D.N.Y.1990); *see also Consolidated Rail Corp. v. Railway Labor Executives' Ass'n,* 491 U.S. 299, 314–15, 109 S.Ct. 2477, 2486–87, 105 L.Ed.2d 250 (1989) (Rule G has industry-wide application) (*"Conrail "*).

Milam is required pursuant to the Federal Railroad Administration ("FRA"), 49 C.F.R. part 219 (1991) ("Part 219"), and the Agreement to participate in Metro–North's random drug testing program and must supply a urine sample when ordered to do so by Metro–North. The FRA regulations define the "Hours of Service" employees' use of alcohol an legal controlled substances and prohibit the use of illegal drugs. *See* 49 C.F.R. §§ 219.101–219.103. The regulations also set forth the carriers' duties with regard to alcohol and drugs, providing that when "a positive test result [is] reported by the railroad's Medical Review Officer," the railroad has "reason to believe that an employee has violated" the alcohol or drug prohibition, and "the railroad shall immediately remove the employee from covered service." 49 C.F.R. § 219.104(a). Finally, the FRA regulations provide a hearing procedure in the event an employee contests the validity of a test result. 49 C.F.R. § 219.104(c).

On January 16, 1990, pursuant to 49 C.F.R. § 219.601(d)(2), Metro–North commenced random testing of employees covered under the FRA and the Agreement. Milam's drug test, which constitutes the source of this action, was conducted on August 9, 1990. On August 17, 1990, Herrlin notified Milam that the laboratory report showed positive for opiates, and Tulli ordered Milam to be taken out of service as of that date. The Department then formally charged Milam with a violation of Rule G on August 20, 1990.

Milam requested that Metro–North and its medical department submit his urine sample to a further test, which was available and would have revealed that the positive reading on the sample in question was a false positive.[3]

---

**1.** Rule 12(b)(6) also imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). *Accord Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984) (quoted in *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 250–51, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989)).

**2.** Rule G provides that

The use of intoxicants, narcotics, marijuana, amphetamines or hallucinogens or other controlled substance by employees subject to duty, or their possession or use while on duty, is prohibited and is sufficient cause for dismissal. Employees under medication before or while on duty must be certain that such use will not affect the safe performance of their duties. Metro–North Commuter Railroad Rules of the Operating Department, Rule G.

**3.** In their Memorandum in Opposition, the Plaintiffs allege that "[d]espite a request by the plaintiff, JOHN V. MILAM, that the defendant, METRO–NORTH COMMUTER RAILROAD, not test him …, the defendants … refused to refrain from negligently testing him." Pls.' Mem.L.Op. Dfs.' Mot. Dismiss at 5. However, this is the first time this allegation is raised. The Complaint

Milam also requested that the formal disciplinary investigation scheduled pursuant to Rule 50 of the Agreement[4] be postponed from August 28, 1990 to September 10, 1990. On September 10, however, instead of proceeding with the disciplinary investigation, Milam signed a "Waiver Letter: Substance Abuse," waiving his right to an investigation within the contractual time limits and agreeing to follow a treatment program prescribed by Metro–North's Employee Assistance Program ("EAP").[5]

On September 21, 1990, Herrlin notified the Department that a further test of Milam's urine sample revealed it to be negative, and, accordingly, Tulli authorized Milam's return to service that same day. On September 24, 1990, the Department formally notified Milam that the disciplinary investigation was cancelled and that he would be compensated for his time out of service pursuant to the Agreement. Milam was reinstated with pay for all time last and has continued to work for Metro–North without incident since that time.

Milam alleges that the urinalysis was "negligently and improperly performed," resulting in a "false positive" reading, Compl. at ¶¶ 7, 8, and in Milam's removal from service, *id.* at ¶ 11. In his first cause of action, Milam contends that the Defendants violated the FELA by negligently causing him "to suffer mental anguish, depression, [and] emotional distress, and ... to seek psychiatric treatment." *Id.* Milam also contends, in the second cause of action, that the Defendants owed him a duty to keep the result of the urine test confidential, and that the Defendants breached this duty when they "negligently remov[ed] him from his job and negligently expos[ed] him to public ridicule and humiliation." *Id.* at ¶ 20. Again, Milam asserts as his injury resulting from the Defen-

dants' negligence, mental anguish, emotional distress, and depression which required him to seek psychiatric treatment.

In the third cause of action, Vivian Milam sues derivatively under the common law theory of loss of consortium. She allege that, as a result of the Defendants' negligent actions, she:

> has been deprived of the aid, companionship, company, society, comfort and services of her husband, ..., has suffered loss of consortium ... [; and] has also incurred medical and hospital bills as a result of the treatment being rendered to her husband. ...

*Id.* at ¶¶ 23–24.

### Discussion

#### I. The Plaintiffs' Claims Arise Under the RLA and Not the FELA

In order to determine whether this action was properly removed from the New York Supreme Court to this Court and whether this Court has subject matter jurisdiction, it first must be determined whether the Plaintiffs' claims are accurately characterized as claims arising under the FELA or whether they are actually misidentified RLA claims. Despite the preemptive nature of the RLA over all claims that fall within its scope, the FELA is a free-standing statute that was left entirely intact at the time the RLA was enacted. *See Atchison, Topeka & Santa Fe Ry. Co. v. Buell,* 480 U.S. 557, 566–67, 107 S.Ct. 1410, 1416, 94 L.Ed.2d 563 (1987). Thus a genuine FELA claim brought in any state court "may not be removed to any district court of the United States." 28 U.S.C. § 1445(a).

Nonetheless, "Congress enacted the RLA to promote stability in labor-management relations by providing a framework for resolv-

---

makes no mention of such a request, and the Court fails to find any support for this claim in the Plaintiffs' pleadings that would warrant the assumption of its truth under the requirements of Rule 12(b)(6).

4. The purpose of the investigation is "to develop the facts and determine [the alleged violator's] responsibility, if any, in connection with" the Rule G violation. Letter of V.L. Marowe to Milam, dated Aug. 28, 1990; Tully Decl., Ex. D.

5. The Plaintiffs assert in their Memorandum in Opposition that "[t]he plaintiff's union protested the removal from service under the collective bargaining contract...." Pls.' Mem.L.Op.Dfs.' Mot. Dismiss at 5. But, again, this allegation appears for the first time there and not in the Complaint.

ing labor disputes in the railroad industry." *Melanson v. United Air Lines, Inc.*, 931 F.2d 558, 561 (9th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 189, 116 L.Ed.2d 150 (1991); *accord Buell,* 480 U.S. at 562, 107 S.Ct. at 1414. In order to facilitate the quick resolution of disputes between employees and employers, the RLA establishes an arbitration system that preempts other avenues of securing relief arising from an employee's grievance. *See Andrews v. Louisville & Nashville R.R.*, 406 U.S. 320, 322–26, 92 S.Ct. 1562, 1564–66, 32 L.Ed.2d 95 (1972) (expressly overruling *Moore v. Illinois Central R.R.*, 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089 (1941)).

█ In the event that a claim has been mislabeled as a FELA claim when it is actually an RLA claim, however, that claim may be so removed. *See Hammond v. Terminal R.R. Ass'n,* 848 F.2d 95, 97 (7th Cir.1988), *cert. denied,* 489 U.S. 1032, 109 S.Ct. 1170, 103 L.Ed.2d 229 (1989). Any attempt to avoid the exclusive remedies of the RLA by "artful pleading" will not be tolerated. *Magnuson v. Burlington Northern, Inc.*, 576 F.2d 1367, 1369 (9th Cir.), *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). An RLA-covered employee cannot choose between a remedy provided in the collective bargaining agreement and one under common law; his exclusive forum and remedy is that provided by the RLA's mandatory dispute resolution procedures. *See Andrews,* 406 U.S. at 325–26, 92 S.Ct. at 1565–66; *see also Grote v. Trans World Airlines, Inc.*, 905 F.2d 1307, 1310 (9th Cir.), *cert. denied,* 498 U.S. 958, 111 S.Ct. 386, 112 L.Ed.2d 397 (1990) (emotional distress and defamation claims preempted by RLA); *Edelman v. Western Airlines, Inc.*, 892 F.2d 839, 844–45 (9th Cir.1989) (breach of implied contract, emotional distress and defamation claims preempted); *Hannah v. Metro–North Commuter R.R. Co.*, 753 F.Supp. 1169, 1175 (S.D.N.Y.1990) (wrongful discharge and libel claims preempted).

█ A plaintiff has engaged in the prohibited "artful pleading," in two situations: first, if it is necessary for a plaintiff to make reference to the collective bargaining agreement in order to establish his claim, then the claim is not a free-standing FELA claim, *see Melanson,* 931 F.2d at 562–63; and second, even if explicit reference to the collective bargaining agreement can be avoided by the plaintiff, if his claim is founded on some incident of the employment relation, then the claim arises under the RLA and not the FELA, *see Majors v. U.S. Air, Inc.*, 525 F.Supp. 853, 857 (D.Md.1981) (citing *Elgin, J. & E.R. Co. v. Burley,* 325 U.S. 711, 723, 65 S.Ct. 1282, 1289–90, 89 L.Ed. 1886 (1945)).

█ In support of their contention that removal was inappropriate, the Plaintiffs contend that their "claims do not rest on the contents of the collective bargaining agreement, nor is any reference to that agreement necessary to illustrate the defendants negligence." Pls.' Mem. at 10. This assertion, however, does not survive an analysis of the nature and content of these claims.

When an employee challenges a positive test result, the regulations afford him the right to a "prompt post-suspension hearing before a presiding officer other than the charging officer." 49 C.F.R. § 219.104(c)(1). Further, "[t]his hearing may be consolidated with any disciplinary hearing arising from the same accident or incident (of conduct directly related thereto), but the presiding officer shall make separate findings as to compliance with §§ 219.101 and 219.102 of this part." 49 C.F.R. § 219.104(c)(1). In all other respects, the hearing procedure set forth in the regulations is the same as that available under the RLA.

Thus, the regulations provide that "[t]he hearing shall be convened within the period specified in the applicable collective bargaining agreement," 49 C.F.R. § 219.104(c)(2), and that "[a] post-suspension proceeding conforming to the requirements of an applicable collective bargaining agreement, together with the provisions for adjustment of disputes under section 3 of the [RLA], shall be deemed to satisfy the procedural requirements of this paragraph," 49 C.F.R. § 219.104(c)(3).

The regulations neither diminish nor enhance an employee's exiting rights under an RLA collective bargaining agreement. Thus

they specifically provide that they are not to be:

deemed to abridge any additional procedural rights or remedies ... that are available to the employee under a collective bargaining agreement .. [or] the [RLA] ... with respect to the removal [from service] or other adverse action taken as a consequence of a positive test result in a test authorized or required by this part.

49 C.F.R. § 219.104(c)(4). Nor do the regulations require disciplinary action and specifically provide that they do not:

restrict the discretion of the railroad to treat an employee's denial of prohibited alcohol or drug use as a waiver of any privilege the employee would otherwise enjoy to have such prohibited alcohol or drug use treated as a non-disciplinary matter or to have discipline held in abeyance.

49 C.F.R. § 219.104(c)(5).

With regard to Milam's first claim, in order to prove that the Defendants breached a duty of care owed to him in taking him out of service, Milam would· necessarily refer to § 219.104, which specifically incorporates the grievance-to-arbitration procedure of the RLA previously described. Furthermore, Milam would have to establish this claim within the context of his various actions in response to the test result, including signing a "waiver letter"—an established past practice of the Defendants and an industry-wide practice recognized by the FRA, see 49 C.F.R. § 219.104(c)(5), electing to undergo treatment, and postponing the disciplinary investigation. Finally, Milam would have to refer to those provisions of the Agreement setting forth the terms and conditions governing the procedures of the random testing program, which impose certain duties on both the Defendants and Milam and create certain rights in Milam.

To prove the elements of his second claim, Milam would have to show that, as a result of the allegedly negligent reporting of the "false positive" result, Metro–North wrongfully held him out of service and charged him with a violation of Rule G, which caused the alleged emotional distress. To demonstrate that aspect of the claim, Milam would be required to refer to the Substance Abuse Policy and to the procedure for disciplinary investigations set forth in Rule 50 of the Agreement. It is not the case that Milam could prove the negligence and the resultant emotional distress he alleges without referring to the terms and conditions of his employment as they are set forth in Part 219 and the Agreement. See Andrews, 406 U.S. at 323–24, 92 S.Ct. at 1564–65.

Therefore, Milam's claims are not freestanding FELA claims but are, rather, disguised RLA claims that necessarily involve reference to the RLA and the Agreement and are founded on the employment relation between Milam and Metro–North.

## II. The Plaintiffs Fail to State a Claim Under the FELA

Although Milam must refer to the Agreement and the RLA in proving his claims, in light of the holding in Buell that the rights of railroad workers secured by the FELA remain unaffected by the RLA, it is necessary to assess Milam's claims and determine whether they can be sustained under the FELA.

### A. Emotional and Mental Distress

While the FELA does allow claims for damages arising from injury while working for a railroad, see 45 U.S.C. § 51, damages may not be recovered under the FELA for emotional injuries that are not accompanied by physical injury but are the result of "emotional anguish" caused by accusations against the employee, "falsely or otherwise, of a serious workplace offense." See Feldleit v. Long Island R.R., 723 F.Supp. 892, 900–01 (E.D.N.Y.1989).

In Feldleit, the plaintiff had been suspended with pay pending an investigation of charges that he had sexually harassed his supervisor. After a six-week suspension, the charges were dropped, and the plaintiff was returned to service in a different department with no reduction in his pay. He worked in this new position for several months and then resigned. The plaintiff brought numerous state-law claims against the defendant railroad, including claims for the intentional infliction of emotional harm and conspiracy to

defame, and his wife brought a derivative claim for loss of consortium.

After assessing these various claims within the context of the relationship between the RLA and the FELA, the Honorable Jack B. Weinstein dismissed them on the ground that:

> [t]o allow recovery under FELA under the circumstances of the instant case would undermine the comprehensive administrative procedures established by the RLA.
>
> Neither the RLA or the FELA suggest that employers who in good faith comply with the national policy aimed at eradicating employment discrimination against women should risk incurring liability for tort damages for the emotional distress suffered by a worker accused of sexual harassment by a fellow employee. Whatever emotion distress was experienced by plaintiff was an unavoidable effect of the nature of the employer-employee dispute.
>
> Particularly where the RLA is involved, there is good reason to construe the FELA to exclude non-physical injuries of the kind claimed here as a predicate for recovery for emotional harm. In this case, not only has there been no showing of negligence, but there is also no basis to conclude that plaintiff was subject to the type of unconscionable abuse which is a prerequisite to recovery for a purely emotional injury.

*Id.* at 901 (citations and internal quotations omitted); *see also Cohen v. Metro–North Commuter R.R.*, No. 89 Civ. 7498 (RJW), 1991 WL 4699 (S.D.N.Y. Jan. 11, 1991) (holding no FELA claim for emotion distress arising from charges of disciplinary violations).

The reasoning in *Feldleit* is equally applicable to the matter at hand. First, Milam's alleged injuries arise out of conduct which is subject to the grievance-to-arbitration procedures set forth in the Agreement and in Section 3 of the RLA. *See* 49 C.F.R. § 219.104. Second, the record on these motions supports the conclusion that Metro–North and Defendants Herrlin and Tulli were complying in good faith with the national policy to eliminate railroad accidents attributable to employees' use of drugs and alcohol. *See* 49 C.F.R. § 219.1(a) ("The purpose of this part is to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs."). Third, Milam pleads no facts that would raise even the possibility that he was subject to the "unconscionable abuse which is a prerequisite to recovery" for a purely emotional injury. *Buell,* 480 U.S. at 566 n. 13, 107 S.Ct. at 1416 n. 13 (1987).[6]

### B. *Prima Facie Tort* [7]

In his Second Cause of Action, Milam alleges that the Defendants breached their obligation to keep the results of the drug test confidential. However, even if the Complaint is read in the most generous light and it is assumed that Milam has plead the requisite elements of such a claim, the claim fails because statements made in the employment context concerning the qualifications and actions of employees are qualifiedly privileged. *See McManus v. McCarthy,* 586 F.Supp. 302, 305–06 (S.D.N.Y.1984); *Stukuls v. New York,* 42 N.Y.2d 272, 397 N.Y.S.2d 740, 744, 366 N.E.2d 829, 832–33 (1977);

---

**6.** In finding that Milam's first claim turns solely on an allegation regarding emotional distress without physical injury or the threat of physical injury, the Court notes that Milam pleads no facts to show that there was any physical "invasion" of his person before, during, or after his act of urination which produced the sample in question. His attempt to identify the urinalysis with physical injury ignores the fact that the test about which he complaints was a random test lawfully conducted pursuant to regulations promulgated by the FRA in Part 219. While the collection and testing of urine specimens required by the regulations are "searches" within the meaning of the Fourth Amendment, *see Skinner v. Railway Labor Executive's Ass'n,* 489 U.S. 602, 616–18, 109 S.Ct. 1402, 1412–13, 103 L.Ed.2d 639 (1989), this does not make them physical "invasions" and "injuries" to support a FELA claim.

**7.** The Defendants characterize this claim as one sounding in the tort of defamation, while the Plaintiffs contend that it sounds in prima facie tort and cite *Singer v. Jeffries & Company, Inc.,* 160 A.D.2d 216, 553 N.Y.S.2d 346, 348–49 (1st Dep't 1990) for the proposition that this is a "defamation-type claim." In light of the disposition of this claim on the ground of the Defendants' qualified privilege to disclose the result of Milam urinalysis to interested parties employed by the railroad, this dispute over how to characterize the claim is irrelevant.

*Murphy v. Herfort*, 140 A.D.2d 415, 528 N.Y.S.2d 117, 118–19 (2d Dep't 1988); *Pappalardo v. Meisel*, 112 A.D.2d 277, 491 N.Y.S.2d 723, 723 (2d Dep't 1985).

This privilege is destroyed only by the plaintiff showing that the defendant acted with "actual malice," *see McManus*, 586 F.Supp. at 305–06; *Trails West, Inc. v. Wolff*, 32 N.Y.2d 207, 344 N.Y.S.2d 863, 873, 298 N.E.2d 52, 59 (1973), and to defeat the Defendants' present motion, the Plaintiffs must offer more than a mere showing of surmise, conjecture, and suspicion, *see Trails West*, 344 N.Y.S.2d at 873, 298 N.E.2d at 59; *Shapiro v. Health Ins. Plan of Greater N.Y.*, 7 N.Y.2d 56, 194 N.Y.S.2d 509, 516, 163 N.E.2d 333, 338 (1959); *Pappalardo*, 491 N.Y.S.2d at 723.

■ Metro–North has a duty and a right to investigate the alleged misconduct or poor performance of its employees, *see* Part 219, and Metro–North's communications concerning the results of such investigations to the affected employee and other interested employees are qualifiedly privileged. *See Missick v. Big V Supermarkets, Inc.*, 115 A.D.2d 808, 495 N.Y.S.2d 994, 997 (3d Dep't 1985); *La Scala v. D'Angelo*, 104 A.D.2d 930, 480 N.Y.S.2d 546, 547 (2d Dep't 1984).

In his Second Cause of Action, Milam asserts that the Defendants owed him a duty to keep the result of his drug test "strictly confidential," regardless of the whether the result was negative or positive. Compl. at ¶ 17. Milam claims this duty is grounded both in New York's common law and statutory law, but he makes no attempt in any of his pleadings either to identify the source or to describe the scope of this alleged duty. He offers nothing more than conjecture and surmise regarding this duty and the Defendants alleged breach of it. Therefore, Milam has failed to state a claim for prima facie tort that defeats the Defendants qualified privilege and arises under the FELA with respect to his removal from service following the publication of his drug test result to the appropriate interested employees of Metro–North.

## III. The Plaintiffs' Claims Are Preempted By the RLA

In light of the conclusions that Milam's claims arise under the RLA and fail to state of cause of action under the FELA, it remains to be determined whether these claims and this Court's jurisdiction are preempted by the grievance-to-arbitration mechanism of the RLA. If they are preempted under the RLA, the adjustment board would have exclusive jurisdiction, and this Court would have to dismiss the Complaint for lack of subject matter jurisdiction. The resolution of this issue turns on whether Milam's dispute with Metro–North is "minor" in nature and triggers the preemptive mechanism of the RLA.

### A. *The Plaintiffs' Claims Are "Minor" Disputes*

■ Claims involving the interpretation or application of RLA collective bargaining agreements, which define rights of the parties, are "minor" disputes subject to the exclusive jurisdiction of the adjustment board, and they stand in contrast to "major" disputes, which involve the formation of collective bargaining agreements or their modification. *See Baylis v. Marriott Corp.*, 843 F.2d 658, 662–63 (2d Cir.1988); *Independent Union of Flight Attendants v. Pan Am. World Airways, Inc.*, 789 F.2d 139, 140 (2d Cir. 1986) ("*Flight Attendants*"); *Air Cargo Inc. v. Local Union 851, Int'l Bhd. of Teamsters*, 733 F.2d 241, 245 (2d Cir.1984); *Air Line Pilots Ass'n v. Texas Int'l Airlines, Inc.*, 656 F.2d 16, 20 n. 6 (2d Cir.1981).

■ The term "minor dispute" refers to a wide range of employee-employer disputes. It encompasses the "grievances that arise daily between employees and carriers regarding rates of pay, rules and working conditions." *Union Pac. R.R. v. Sheehan*, 439 U.S. 89, 94, 99 S.Ct. 399, 402, 58 L.Ed.2d 354 (1978) (*per curiam*). The term also refers to disputes that are "arguably governed" by the collective bargaining agreement or have a "not obviously insubstantial" relationship to it, such that these disputes are "inextricably intertwined with the grievance machinery of the collective bargaining agreement and of the R.L.A." *Magnuson*, 576 F.2d at 1369–70

(citations and internal quotation marks omitted).

"Where an employer asserts a contractual right to take [a] contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective bargaining agreement." *Conrail*, 491 U.S. at 307, 109 S.Ct. at 2482–83. This includes a dispute arising from a railroad's unilateral imposition of a urinalysis program to screen its employees for drug use when the employees' union had given the railroad unilateral authority in the past to determine the appropriate tests to conduct during employee medical examinations. *See Railway Labor Executives Ass'n v. Norfolk & W. Ry. Co.*, 833 F.2d 700, 706–07 (7th Cir.1987). Such disputes are "minor" in nature because they can be resolved by an interpretation of existing agreements.

Finally, "the labor management adjustment boards, created pursuant to [RLA § 204,] 45 U.S.C. § 184, have exclusive jurisdiction over 'minor disputes,' which include disciplinary disputes even if involving employee discharge." *Flight Attendants*, 789 F.2d at 141; *see also Andrews*, 406 U.S. at 323–24, 92 S.Ct. at 1564–65 (allegation of "wrongful discharge" does not save plaintiff's action from RLA's mandatory provision for the processing of grievances); *Zimmerman v. Atchison, Topeka & Santa Fe Ry. Co.*, 888 F.2d 660, 662 (10th Cir.1989) (dispute between railroad and former employee, who claimed he was demoted in violation of protective agreements contained in collective bargaining agreement, and in bad faith and with malicious motive, was "minor dispute" under exclusive jurisdiction of adjustment board)[8]; *Carson v. Southern Ry. Co.*, 494 F.Supp. 1104 (D.S.C.1979) (dispute between railroad and employee over supervisor's action of taking employee out of service and charging him with a violation of Rule G because he appeared to be drunk on duty was a "minor dispute" arising under the collective bargaining agreement and thus claim was in exclusive jurisdiction of the adjustment board).

Milam's claims constituted a "minor" dispute under the RLA. Ultimately, they could have been resolved through the interpretation of the existing Agreement by arbitration before the adjustment board. *See id.* at 1112. In fact, this dispute was resolved through one of the dispute-resolution avenues available to an employee through the RLA and the Agreement, namely, the mechanism involving the waiver letter and voluntary treatment.

### B. *Preemption*

Claims arising out of "minor" disputes are preempted by the RLA even when it appears that no specific provision of the collective bargaining agreement is directly applicable. *See generally Conrail*, 491 U.S. at 312, 109 S.Ct. at 2485 ("In this case, Conrail's contractual claim rests solely upon implied contractual terms, as interpreted in light of past practice. Because we agree with Conrail that its contractual claim is neither frivolous nor obviously insubstantial, we conclude that this controversy is properly deemed a minor dispute within the exclusive jurisdiction of the [Adjustment] Board.")[9]; *Andrews*, 406 U.S. at 323, 92 S.Ct. at 1564 ("the compulsory character of the administrative remedy provided by the [RLA] ... stems not from any contractual undertaking between the parties but from the Act itself"); *Majors*, 525 F.Supp. at 857 ("So long as [plaintiff's] claim is founded on some incident of the employment relation, it is immaterial, for purposes of coverage by the [RLA],

8. In *Zimmerman,* the Tenth Circuit noted that the reasoning in *Andrews,* regarding the preemptory force of the RLA, was even more compelling here because unlike the plaintiff in *Andrews,* Zimmerman remained employed by the defendant railroad despite his demotion. On this reading of *Andrews,* its reasoning is even more compelling when applied to the matter at hand than when it is applied to *Zimmerman* because Milam not only remains in Metro–North's employ, he was returned to service as a tower operator and received full compensation for the wages that were withheld from him less than two weeks after he signed the waiver letter.

9. More specifically, the Supreme Court held that the railroad's inclusion of drug testing in periodic and return-from-leave physical examinations was justified by the implied terms of the collective bargaining agreement and was, therefore, a "minor dispute" under the RLA within the exclusive jurisdiction of the Adjustment Board.

whether the claim is expressly covered by the collective bargaining agreement, or is independent of that agreement."). The question then is whether the Plaintiffs' claims constitute an attempt to enforce the Agreement and thereby fall under the preemptive scope of the RLA. *See Hammond,* 848 F.2d at 97.

In *Farmer v. United Bhd. of Carpenters & Joiners, Local 25,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), the Supreme Court set forth the two-pronged test by which the preemptive power of the RLA is triggered: first, the state interest in the claim must be limited; and second, state action creates the potential for interference with the federal regulatory scheme. *Id.* at 297, 97 S.Ct. at 1061–62.

With regard to the first prong of the *Farmer* test, even if the State of New York has an interest in protecting its citizens from the possibility of false positive results in random urinalysis tests, that interest is not "so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Id.* at 296–97, 97 S.Ct. at 1061–62 (quoting *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 243–44, 79 S.Ct. 773, 778–79, 3 L.Ed.2d 775 (1959)). Furthermore, the legitimate concerns that the State of New York has in this area are necessarily tempered by the fact that the issue of random testing is an explicit issue addressed in the collective bargaining process between the railroad and the union. Thus the worker is not left to his own devices to assert his rights in negotiating with his employer. Rather, the worker's union protects his interest in the area of drug testing through its power and ability to bargain behalf of him and other union members.

With regard to the second prong, the urinalysis test about which the Plaintiffs' complain was a random test conducted pursuant to regulations promulgated by the FRA in Part 219. Part 219 is a critical feature of the federal regulatory scheme governing the actions and condition of railway workers. The method of testing is also a critical issue addressed in the collective bargaining pro-

cess and a key feature of the Agreement. To permit Milam to bring state claims arising from the federally mandated and defined test that was an item explicitly addressed in the Agreement would seriously undermine the effectiveness of the mandatory arbitration provisions of the RLA, and it is this provision that was intended to facilitate timely resolution of all disputes between employees and employers in the railroad industry.

Therefore, Milam's dispute with Metro–North is a minor dispute and is of such a character that it triggers the preemptive force of the RLA. While this action was appropriately removed from the Supreme Court of the State of New York to this federal court, *see Boggs v. Consolidated Rail Corp.,* 112 LRRM (BNA) 2295, 93 Lab.Cas. (CCH) ¶ 13,353, 1982 WL 2158 (E.D.Pa. 1982); *Carson,* 494 F.Supp. at 1105, this Court does not have subject matter jurisdiction to reach the merits of the Plaintiffs' claims under the RLA. Jurisdiction over the subject matter of this action and its underlying dispute rests exclusively with the adjustment board.

### IV. The Claim for Loss of Consortium is Derivative and Must Be Dismissed

Under New York common law, a claim for loss of consortium or services is a derivative action and does not exist "independent of the injured spouse's right to maintain an action for injuries sustained." *Jordan v. Lipsig, Sullivan, Mollen & Liapakis, P.C.,* 689 F.Supp. 192, 196 (S.D.N.Y.1988) (quoting *Liff v. Schildkrout,* 49 N.Y.2d 622, 427 N.Y.S.2d 746, 749, 404 N.E.2d 1288, 1291–92 (1980)). Although a wife has a right to recover for loss of consortium, when "the husband's cause of action has been terminated wither by judgment, settlement or otherwise, that should operate to bar the wife's cause of action for consortium." *Jordan,* 689 F.Supp. at 197 (quoting *Millington v. Southeastern Elevator Co.,* 22 N.Y.2d 498, 507–08, 293 N.Y.S.2d 305, 312, 239 N.E.2d 897, 902–03 (1968)); *see also Wittrock v. Maimonides Medical Ctr.,* 119 A.D.2d 748, 501 N.Y.S.2d 684, 685 (2d Dep't 1986) (dismissal of wife's main action for medical malpractice required

dismissal of husband's derivative claim for loss of consortium).

Therefore, because Milam's claims are dismissed, the derivative claim of Vivian Milam for loss of consortium is also dismissed. *See Feldleit,* 723 F.Supp. at 902; *Bloss v. United States,* 545 F.Supp. 102, 105 (N.D.N.Y.1982).

### Conclusion

For the foregoing reasons, the Plaintiffs' motion to remand this action to the New York Supreme Court is denied, and the Defendants' motion to dismiss the Plaintiffs' Complaint for failure to state a cause of action for which relief may be granted and for lack of subject matter jurisdiction is granted.

It is so ordered.